### UNITED STATES v. CANYON COUNTY, IDAHO, et al.

#### (District Court, D. Idaho, S. D.   April 29, 1916.)

1. TAXATION ⬤⇒5—PROPERTY SUBJECT TO TAXATION—RIGHTS IN LAND WITHIN RECLAMATION PROJECT.

A patent to lands within a reclamation project, issued to a homestead entryman under Act Aug. 9, 1912, c. 278, § 1, 37 Stat. 265 (Comp. St. 1913, § 4728), on proof of compliance with the provisions of law as to residence, reclamation, and irrigation, conveys the legal title, the government reserving only a prior lien on the land and appurtenant water rights as security for the payment of all sums due or to become due on such water rights, and such lands are taxable by the state; the lien of the tax, however, being subject to the prior lien reserved by the government. Homestead entrymen on such lands, who have made proof of compliance with the general homestead laws, but have not fully complied with the additional requirements of the Reclamation Act as to reclamation and irrigation, have a vested interest, which may be sold, mortgaged, and inherited, and which also is subject to local taxation.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 17, 31-44; Dec. Dig. ⬤⇒5.]

---

⬤⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**2. TAXATION ⬤⟿5—EQUITABLE INTEREST IN PUBLIC LANDS.**

Generally speaking, one who has the right to real property and is not excluded from its use and enjoyment should not be permitted to use the legal title of the government to avoid his just share of taxation.

[Ed. Note.—For other cases, see Taxation, Cent. Dig. §§ 17, 31–44; Dec. Dig. ⬤⟿5.]

In Equity. Suit by the United States against Canyon County, Idaho, L. C. Knowlton, Auditor, Sarah J. Handy, Treasurer, C. Q. Adams, C. B. Ross, and Carl W. Giesler, County Commissioners, and A. O. Christopher, Assessor of said County. On final hearing. Decree for defendants on the merits.

J. L. McClear, U. S. Atty., and B. E. Stoutemyer, both of Boise, Idaho, and A. A. Sessions, of Parma, Idaho, for the United States.

H. A. Griffiths, of Caldwell, Idaho, and Raymond L. Givens, of Boise, Idaho, for defendants.

DIETRICH, District Judge. The suit is brought to enjoin the defendant Canyon county and its officers from taxing lands, or the interests of settlers therein, in what is known as the Boise Reclamation Project, an irrigation system constructed by the government under what is popularly known as the Reclamation Act. For original act, see Act June 17, 1902, c. 1093, 32 Stat. 388 (Comp. St. 1913, §§ 4700–4708), amendment of February 8, 1905, c. 552, 33 Stat. 706 (Comp. St. 1913, § 4741). For amendment of March 3, 1905, 33 Stat. 1032, c. 1459 (Comp. St. 1913, § 4742); amendment of April 16, 1906, 34 Stat. 116, c. 1631 (Comp. St. 1913, §§ 4715–4719); amendment of June 12, 1906, 34 Stat. 259, c. 3288 (Comp. St. 1913, § 4709); amendment of June 27, 1906, 34 Stat. 519, c. 3559 (Comp. St. 1913, §§ 4720–4724); amendment of June 11, 1910, 36 Stat. 465, c. 284 (Comp. St. 1913, §§ 4725, 4726); amendment of June 23, 1910, 36 Stat. 592, c. 357 (Comp. St. 1913, § 4727); amendments of June 25, 1910, 36 Stat. 835, c. 407 (Comp. St. 1913, §§ 4710–4714), and 36 Stat. 864, c. 432 (Comp. St. 1913, § 4735); amendment of February 2, 1911, 36 Stat. 895, c. 32; amendment of February 13, 1911, 36 Stat. 902, c. 49 (Comp. St. 1913, § 4737); amendment of February 18, 1911, 36 Stat. 917, c. 111 (Comp. St. 1913, § 4714); amendment of February 21, 1911, 36 Stat. 925, c. 141 (Comp. St. 1913, §§ 4738–4740); amendment of February 24, 1911, 36 Stat. 930, c. 155 (Comp. St. 1913, § 4719); amendment of August 9, 1912, 37 Stat. 265, c. 278 (Comp. St. 1913, §§ 4728–4732); act approved August 13, 1914, 38 Stat. 686, c. 247. The project embraces about 350,000 acres of land in Canyon and Ada counties, Idaho, and Malheur county, Or., the larger portion of which is in the defendant county. The land constitutes a substantial part of the property of the county, and it will at once be apparent that, while formally the issue here is between the government and the county, in reality it also materially affects the interests of a large number of settlers and of many other persons owning property which is unquestionably subject to taxation. While in so far as concerns the state and county the exemption claimed would result only in shifting the burden to other property, when we consider that schools

are maintained and roads and bridges constructed almost exclusively through local taxation, it would, if recognized, give rise to the most perplexing problems of local government. If I rightly apprehend the facts, there are approximately 1,000 entrymen within the defendant county, the great majority of whom, it is to be presumed, are interested in having roads and bridges for their necessities or convenience and schools for the education of their children.

[1] All of the lands in question were public lands of the United States at the time the project was initiated, and were withdrawn for homestead entry under the provisions of the Reclamation Act. For the purposes of the present consideration they readily fall into two classes. The first class comprises entries in which the entrymen have made proof before the land office in conformity with the provisions of the general homestead law, but have not yet fully complied with the additional provisions of the Reclamation Act, requiring that at least one-half of the irrigable acreage of the entry shall be irrigated and reclaimed, and that payment be made for the water rights. The other class embraces entries where the entrymen have made proof, not only of compliance with the general homestead law, but also of the cultivation of one-half of the irrigable acreage, as required by the Reclamation Act, and to whom therefore, patent has issued under Act Aug. 9, 1912, c. 278, §§ 1, 2, 37 Stat. 265 (Comp. St. 1913, §§ 4728, 4729), which provides:

"That any homestead entryman under the act of June 17, 1902, known as the Reclamation Act, including entrymen on ceded Indian lands, may, at any time after having complied with the provisions of law applicable to such lands as to residence, reclamation and cultivation, submit proof of such residence, reclamation and cultivation, which proof, if found regular and satisfactory, shall entitle the entryman to a patent, and all purchasers of water-right certificates on reclamation projects shall be entitled to a final water-right certificate upon proof of the cultivation and reclamation of the land to which the certificate applies, to the extent required by the Reclamation Act for homestead entrymen."

And it further provides that:

"Every patent and water-right certificate issued under this act shall expressly reserve to the United States a prior lien on the land patented or for which water right is certified, together with all water rights appurtenant or belonging thereto, superior to all other liens, claims or demands whatsoever for the payment of all sums due or to become due to the United States or its successors in control of the irrigation project in connection with such lands and water rights.

"Upon default of payment of any amount so due title to the land shall pass to the United States free of all incumbrance, subject to the right of the defaulting debtor or any mortgagee, lien holder, judgment debtor, or subsequent purchaser to redeem the land within one year after the notice of such default shall have been given by payment of all moneys due, with eight per centum interest and cost. And the United States, at its option, acting through the Secretary of the Interior, may cause land to be sold at any time after such failure to redeem, and from the proceeds of the sale there shall be paid into the reclamation fund all moneys due, with interest as herein provided, and costs. The balance of the proceeds, if any, shall be the property of the defaulting debtor or his assignee: Provided, that in case of sale after failure to redeem under this section the United States shall be authorized to bid in such land at not more than the amount in default, including interest and costs."

There is attached to the bill a form of the patent held by each one of the entrymen falling within this class. The patent recites (from the act of August 9, 1912) not only the provision for a lien in favor of the government, above quoted, but the further provision to the effect that no person shall, so long as any reclamation charges remain unpaid, hold more than one farm unit upon a reclamation project, excepting in cases where the excess has been acquired "in good faith by descent, by will, or by foreclosure of any lien," in which case it may be held for two years after its acquisition. Subject to these provisions of the law the grant is in form absolute, the language of the patent being that the United States, in consideration of the premises—

"does give and grant unto the said ——, and to his heirs, the tract above described, together with the right to the use of the water from the Boise Reclamation Project as an appurtenance to the irrigable lands in said tract; to have and to hold the same, together with all the rights, privileges, immunities, and appurtenances of whatsoever nature thereunto belonging, unto the said ——, and to his heirs and assigns forever; subject to any vested and accrued water rights for mining, agricultural, manufacturing, or other purposes, and rights to ditches and reservoirs used in connection with such water rights, as may be recognized and acknowledged by the local customs, laws, and decisions of courts; but excepting, nevertheless, and reserving unto the United States, rights of way over, across, and through said lands for canals and ditches constructed, or to be constructed, by its authority, all in the manner prescribed and directed by the act of Congress approved August 30, 1890 (26 Stat. 391). To secure payment to the United States, or its successors in the ownership or control of the works constituting and appertaining to the said reclamation project, of all sums due or to become due to the United States, or its successors in control of said reclamation project in connection with said lands and water rights, a lien prior and superior to all other liens, claims, or demands whatsoever upon the lands herein and hereby described and conveyed, upon all water rights thereto appurtenant, and upon the right to receive and use water from the reservoirs and canals of said reclamation project, is expressly reserved."

Admittedly, upon the issuance of such a patent, if not before, the entryman may exercise absolute dominion and control over the land and the water right, with full power to occupy, use, mortgage, and sell the same.

In relation to this class as well as the other the tax records of the county disclose an irregularity to which in the argument some significance was attached. At the time the suit was commenced it appeared upon the face of the assessment book that all of these lands were assessed in the same manner as other lands privately owned, without any reference to or express elimination of the lien or interest of the government. Shortly after the service of process in the case, at a meeting of the board of county commissioners, an order was entered authorizing and directing the assessor to insert before the name of each taxpayer the words "equity of," thus expressly limiting the assessment to such equity as the person named had in the tract of land described, and by implication recognizing an exemption in favor of the government. The assessor at once complied with the order, and preliminarily therefore we have the question of the validity and effect of these proceedings. While the evidence adduced at the trial leaves no doubt in my mind that in making and equalizing the original

assessment the county officers had in fact attempted to, and did, value only the private interest of the entryman, and intended to exclude the government's lien or interest, as against the taxpayer there is room for serious doubt whether, in view of the fact that the time for assessing and equalizing taxes had expired, the officers possessed the power to so change the record; but that question I do not decide, for the taxpayers are not seeking relief and the matter is of no substantial concern to the plaintiff. The plaintiff does not sustain such a relation to the taxpayers as to authorize it to maintain a suit of this character in their behalf, and indeed the bill does not purport to be brought in their interest. It is not like a case brought to enjoin the taxation of Indian lands, where, by reason of its relation of guardianship to the Indians, it is the duty of the government as well as its right to protect their interests. It is here professedly seeking injunctive relief against proceedings which it avers will cloud its title, and therefore, if its proprietary interests are not injured or imperiled, it is in need of no relief. Upon having its attention called to these proceedings by the institution of the suit, the county promptly and unequivocally disclaimed any intention to tax the plaintiff's interest or impair its lien, by passing and entering of record the resolution referred to and altering its assessment roll in conformity therewith. Moreover, the county is here conceding that it cannot tax or proceed against the plaintiff's interest or prejudice its lien, and therefore, to put at rest any question touching the effect of the resolution, the decree herein may, as of course, place such a limitation upon the operation of the assessment, and forbid further proceedings out of harmony therewith. The discussion of the substantive issues will therefore be upon the assumption that the county is assessing and proceeding against only the interest or equity of the entryman, exclusive of that of the government.

Both the facts and the statutory provisions relating to the second class of lands have already been set forth with considerable fullness, and as a matter of convenience we may as well dispose of this branch of the case first. The averment made in the complaint and the position taken by complainant at the argument that the patent is conditional, and conveys to the entryman only "a conditional right to the use and occupation" of the land, are untenable. The patent is absolute, and conveys title in fee simple to the entryman. While the government has apparently been careful to exclude from the case lands which were privately owned when the project was started, but which by purchase obtain water therefrom, it must be clear that no substantial distinction can be drawn between the status of such lands and that of the lands in question. In either case a patent has been issued purporting wholly to divest the government of title, and to convey it to the entryman. In both cases liens of the same quality are reserved in favor of the government, to secure the discharge of obligations identical in character. Default of the owner in one case is followed by the same consequences which ensue in the other, for in either case "upon default of payment of any amount" due, "title to the land shall pass to the United States," etc. The plaintiff complains that its title will be clouded by the tax proceedings, when in truth it has no title at all.

It has voluntarily alienated its title, and for security has reserved a lien upon the property transferred. Suppose that it were here asking for relief against taxes upon land within the project for which patent issued a quarter of a century ago, and which has been brought and sold and mortgaged and taxed, as any other 'land privately owned. It could bring to the support of its prayer every consideration which it now urges. Under the provisions of the statute it would have a paramount lien upon the land for the unpaid purchase price of the water right certified therefor. This lien would have the same origin, would be for the same purpose, and would be quite as sacred, as the liens here involved. If the enforcement of the tax would impair or render inefficient the liens here, it would operate with like effect there, and if there is anything in the suggestion that the state cannot tax because at a tax sale persons already holding farm units on the project are disqualified from becoming purchasers at a tax sale, it would have the same force in the hypothetical case. It follows that, if the plaintiff's position is well taken, we would have the anomalous condition where property privately owned has been taxed for 25 years, and though continuing to be privately owned, and though having a value greatly enhanced to the owner through the acquisition of the water right, it ceases to be taxable because the government has acquired a lien thereon for deferred payments on account of the purchase price of the water right. The suggestion that the assessment is invalid because, under one of the provisions of the statute and of the patent above quoted, no person may hold more than one irrigable farm unit on a project, and that therefore entrymen would be disqualified from becoming purchasers at a possible sale, is without substance. It would be quite as reasonable to argue that, because the state limits the real estate holdings of corporations and disqualifies certain aliens from holding real estate at all, it is therefore powerless to levy a tax on real property. Qualified purchasers for these lands, in case they are offered at a tax sale, there doubtless would be in great numbers, and the county need have little concern lest the tax fail for the want of bidders. However that may be, it is a consideration which the plaintiff is not in a position to urge.

The other objection has more semblance of merit; but it, too, I think must be denied. It is that to be valid at all the tax must of necessity be deemed to create a lien superior to that of the government. It is to be borne in mind that the county is not putting forth such a claim of superiority. On the contrary, it concedes that its tax is in subordination to the government's lien. The plaintiff's position is that such a concession is incompetent, and hence ineffective, and that the county must tax all or nothing, and cannot sell subject to the lien. Authority for this view is supposed to be found in N. P. Ry. Co. v. Trail County, 115 U. S. 600, 6 Sup. Ct. 201, 29 L. Ed. 477. But whatever significance might legitimately be attached to this case, if it stood as the only or the last expression of the Supreme Court upon the subject, it is unnecessary to inquire, for in so far as it is pertinent to the present issue it must be deemed to have been limited in its application, if not modified, by the more recent opinion of that court in Baltimore Ship Building Co. v. Mayor, et al., 195 U. S. 375,

25 Sup. Ct. 50, 49 L. Ed. 242, which enunciates principles so conclusive, in favor of the defendants, of the issues under this branch of the case, that further discussion is thought to be unnecessary.

The right to tax the first class of lands is not so clear. The legal title thereto remains in the government, the entrymen have not paid in full for their water rights, and they have not brought the requisite acreage under cultivation and irrigation. Still it must be apparent that they have something more substantial than a mere contingent interest. Upon proof of compliance with the general homestead law and the issuance of a certificate to that effect, they became possessed of rights of which they can be divested only through their default or voluntary relinquishment. It is a vested interest which they have, and not a bare option to purchase when and if the government sees fit to sell. They not only have the full and exclusive use of the lands, but they may by assignment transfer them in whole or in part, and thus realize in money the entire value thereof. Act June 23, 1910, 36 Stat. 592. They may also mortgage, and the mortgagee may foreclose and protect himself by bidding at the foreclosure sale. General Reclamation Circular of Sept. 6, 1913, p. 28. On the death of the entryman his heirs succeed to his rights. If, then, the entryman has the valuable right of possession and use, and the unqualified power to acquire the legal title—in other words, if he has a vested interest which may be sold, mortgaged, and inherited—it is difficult to see why it may not also be taxed without impairing or clouding the title of the United States or infringing upon its rights. The interest would seem to be quite as substantial as, and of equal dignity to, the right of the holder of an unpatented mining claim, and it has been repeatedly held that such a claim is taxable. Elder v. Wood, 208 U. S. 226, 28 Sup. Ct. 263, 52 L. Ed. 464, and cases therein cited.

[2] Generally speaking, one who has the right to property and is not excluded from its use and enjoyment should not be permitted to use the legal title of the government to avoid his just share of taxation. Wisconsin Central R. R. v. Price, 133 U. S. 496, 505, 10 Sup. Ct. 341, 33 L. Ed. 687; N. P. R. R. Co. v. Patterson, 154 U. S. 130, 14 Sup. Ct. 977, 38 L. Ed. 934; Maish v. Arizona, 164 U. S. 599, 17 Sup. Ct. 193, 41 L. Ed. 567; N. P. R. R. Co. v. Myers, 172 U. S. 589, 19 Sup. Ct. 276, 43 L. Ed. 564; Baltimore Ship Building Co. v. Mayor, et al., 195 U. S. 375, 25 Sup. Ct. 50, 49 L. Ed. 242. At the hearing it was urged with much earnestness that the tax is upon an instrumentality employed by the government in effectuating its purpose of reclaiming its arid lands, and that for that reason it must be held to be void. The same contention was made and rejected in the Baltimore Ship Building Case, supra. In support of their position counsel for the plaintiff place much reliance upon United States v. Rickert, 188 U. S. 432, 23 Sup. Ct. 478, 47 L. Ed. 532, but a marked distinction is to be drawn between that case and this. There the question related to the right of the state to tax property which was being used by the government for the civilization of the Indians. The Indians, it was said, were still wards of the government, in a condition of pupilage or dependency. They occupied the lands with the consent of the government, and not only were without title thereto, but were

without any right to make contracts with reference to them, or to do more than occupy and cultivate them. The improvements in question constituted a part of such lands. The personal property was purchased with the money of the government, and was furnished to the Indians in order to maintain them on the allotted land during the period of the trust estate, and to induce them to adopt the habits of civilized life. "It was in fact the property of the United States, and was put into the hands of the Indians to be used in the execution of the purpose of the government in reference to them." To permit the state by tax proceedings to wrest from the Indians the property which, in a very wide sense, was owned by, and was under the control of, the government, and which it was not within the power of the Indians to dispose of, would very clearly interfere with the working out of a national policy "by which the Indians are to be maintained, as well as prepared for assuming the habits of civilized life, and ultimately the privileges of citizenship."

No such case is here presented. There is no suggestion of guardianship or paternalism in the Reclamation Act, and in its administration the entrymen are not to be treated as wards of the government. To be sure, the government has a concern for their welfare, as it has for its citizens generally, but the primary purpose of the Reclamation Act is the reclamation of arid lands; the policy thereof pertains to property and not to persons. If its purposes relative to the Indians are to be carried out, the government must see that the Indian, and the land allotted to him, and the cattle and horses and plows furnished to him, are kept together. To permit the state through tax proceedings to take from the allottee his cattle and his allotment would be fatal. Here the conditions are entirely different. One may take up where another lays down the work of reclaiming a farm unit, and therefore there may be a change of ownership and a succession of entrymen without interfering with the government's purpose. Hence it is that it has been found not only feasible, but the part of wisdom, to clothe the entryman with the power to mortgage and assign his entry. Whatever enhances the value of such an entry and makes it more attractive tends to further, rather than impede, the policy of the government. It is a matter of common knowledge that the earlier development of these projects was hampered by reason of the inability of the settlers to utilize their holdings as security for money required for reclamation and improvement purposes, and the want of revenues with which to provide public conveniences. It is not improbable that it was out of consideration for these conditions that the act of June 23, 1910, was passed. There is in fact no substantial ground for the assumption—and it is nothing more than an assumption—that taxation of the settlers' property rights in these entries will interfere with the government in the execution of its purposes. It is not to be assumed that the state will impose an oppressive or discriminating tax for the deliberate purpose of destroying the project. If such were its desire, it could accomplish it as well by levying taxes upon the stock, implements, and other personal property which the settler needs for his maintenance and for carrying on the work of reclamation, and in such property it will be conceded the government

has no interest, and hence could not interfere. We must assume that the tax will be fair and equitable, and sufficient only to provide such public institutions and such public conveniences, and to maintain such governmental agencies, as are reasonably necessary for the comfort, health, and well-being of the community, and that being true we have the right further to assume that government lands in such a community and under such conditions will be more attractive to settlers, and will be more eagerly sought after, and hence more rapidly reclaimed, than in a community where the settler must live under harsh and primitive conditions. In the Indian country the government assumes the responsibility of providing or requiring the Indians to provide for these conditions of civilized society; but in the case of reclamation projects it has and recognizes no such responsibility. If, therefore, as is necessary, the local government must take up the task, it should not be required to make "bricks without straw."

Without further prolonging the discussion, upon full consideration I have concluded that the interest of the settlers in this class, as well as in the other class of lands, is subject to taxation. Such, also, it may be added, has been the conclusion of the Supreme Court of the state. Cheney v. Minidoka County, 26 Idaho, 471, 144 Pac. 343.

Accordingly, the substantial relief prayed for will be denied, but, for the purpose of setting at rest any doubt as to the validity and effect of the order of the board of county commissioners and the subsequent action of the assessor in conformity therewith, a decree will be entered restraining the defendants from asserting any claim against the interest of the government by reason of the tax proceedings, or selling at tax sale any interest other than that of the settler.