THE PEOPLE OF THE STATE OF NEW YORK ex rel. DONNER-HANNA COKE CORPORATION, Relator, *v.* WILLIAM J. BURKE and Others, City Assessors, Respondents.

Supreme Court, Erie County, October 11, 1926.

Taxation — review of assessment — assessment by city of Buffalo of interest of relator in property, with improvements, to which United States government held title — agreement recited relator was to acquire ownership of buildings and equipment on land, on which Federal government erected war-time plant, under deferred payment plan — title was to remain in United States government until purchase price was fully paid in twelve annual installments — assessment made under Tax Law, § 4, subd. 24, as added by Laws of 1925, chap. 99, providing for assessment of interest of corporation in property, to which United States government under contract of sale holds title — assessment illegal and void — Tax Law, § 4, subd. 24, is ex post facto law.

Buildings and equipment erected by the United States government during the World War on land owned by the relator and leased to the Federal government as a site for a plant, which were sold to the relator by the Federal government

under a contract whereby said relator agreed to buy the plant upon certain terms and to pay therefor in twelve annual installments, ending in 1932, with a provision that the title was to remain in the United States government until the relator should have paid for the plant in full, and that upon default said government might retake possession of the property and the payments made should be considered as rental of property of the United States government, are exempt from taxation by the city of Buffalo for the year 1926, notwithstanding the provisions of subdivision 24 of section 4 of the Tax Law, as added by chapter 99 of the Laws of 1925, which provides for the assessment of the interest in any property used or possessed by a corporation under a contract whereby the legal title of said property is in the United States government.

Moreover, subdivision 24 of section 4 of the Tax Law, as added by chapter 99 of the Laws of 1925, is illegal and void as authorizing the taxation of rights or interests acquired under a contract by which the Federal government acquires or disposes of property.

Furthermore, said provision of the Tax Law is an *ex post facto* law because it undertakes to make subject to assessment and taxation property theretofore exempt.

Certiorari to review a tax assessment for 1926, assessing interest of relator in property with improvements.

*John Lord O'Brien* and *Ralph Ulsh,* for the relator.

*Frederic C. Rupp* and *Herbert Hickman,* for the respondents.

Wheeler, Referee. This is a proceeding to review by certiorari an assessment made by the assessors of the city of Buffalo against the relator for the year 1926, purporting to assess the interest of said relator in certain property with the improvements thereon. The assessment roll contains the name of the relator and a brief description of the real property or land on Abby street in the city. Under the column headed " valuation of land " is entered the amount, $307,220, after which is entered the words " land only." In the next line appears the same description of the land, and under the heading " valuation of improvements " is entered the amount $4,122,360, and the assessment is extended at that sum. Between the description of the property and the amount of this assessment there is inserted in the roll the following notation: " This assessment and tax is upon the interest under contract to purchase structures and fixed equipment. Land not included. Interest of the United States not assessed or taxed."

No objection is raised by the relator to the assessment of the land itself, but the relator insists the assessment of $4,122,360 made upon the improvements is illegal and improper. To sustain the relator's contention the attention of the referee is called to the history of these improvements as disclosed by the evidence in the case.

This history is shown by the contracts introduced in evidence between the relator and the United States government. On May 29, 1918, the United States was at war with Germany. In the prosecution of the war the government required certain by-products of the manufacture of coke used in the making of munitions of war. The coke company owned the land suitable for the erection on it of a coke-producing plant and its products. Thereupon on said 29th of May, 1918, the relator and the government entered into a written contract reciting the coke company owned a site adapted to the manufacture of by-products of coke, and the coke company was willing to devote said site, facilities and its organization to the purpose of obtaining for the United States an additional supply of toluol and other like products from a by-product coke oven plant, and had offered to build a 150-oven by-product coke plant.

This contract in substance provided that the coke corporation should lease to the United States the land for the site of the plant; that it should construct and equip a 150-oven by-product coke plant. The relator was to make the necessary expenditures in connection with the construction of the plant in the first instance and the United States was to reimburse the relator for the cost of the plant. It further provided that the title to the plant and to all parts thereof was to be vested in the United States, and that the relator " shall not acquire any property, right, title, or interest of any kind in said plant, or any part thereof, except to the extent and in the manner hereinafter specifically provided; " that exception being with reference to the manner of the sale of the plant.

The contract further provided that the relator should operate the plant for the government and at its expense, and all by-products except coke should be delivered to the government. Upon the expiration of the term of the contract, which was to continue for a period after the termination of the war, the relator was given the right to purchase the plant at a price to be fixed by appraisers. The contract was made unassignable. This contract was carried out, and the coke plant constructed. The war ended, and the government had the plant on its hands.

On June 30, 1920, a second agreement was made by and between the government and the relator, by which the relator was to acquire ownership of the plant under a system of deferred payments. The relator was to pay the government for the plant $5,640,000 in twelve equal annual installments, with interest, the last installment to fall due in 1932. It was provided, however, that the " title to the plant shall remain in the government until the corporation shall have paid for it in full," and that, in the event the coke company made default in making the agreed payments, the govern-

ment was authorized to retake possession of the plant, in which event payments made should be declared rental for the plant up to the date of default, and the coke company agreed to sell to the government the tract of land on which the plant stands at the cost price to the corporation. The corporation further agreed " to maintain the plant in readiness to furnish the quantity and quality of toluol and ammonium sulphate for which the plant was originally designed for fifteen years after December 31, 1920."

In 1921 the assessors of the city of Buffalo assessed these lands and improvements against the relator for the purposes of taxation. The relator instituted certiorari proceedings to review the assessment, claiming the property was exempt from such assessment and taxation on the ground of its being property of the United States. The relator's contention was upheld by the courts. The decision of the Appellate Division is reported in *People ex rel. Donner-Union Coke Corp.* v. *Burke* (204 App. Div. 557). On appeal to the Court of Appeals the decision of the Appellate Division was affirmed without opinion. (236 N. Y. 650.) As a result of these adjudications, and without question at the instance of representatives of the city, the State Legislature at its session of 1925 added subdivision 24 to section 4 of the Tax Law by chapter 99 of the Laws of 1925. It reads:

" 24. Whenever the legal title of real property is in the United States or in this state, but the use, occupation or possession thereof is in a corporation, association, copartnership or individual, or its or his successor in interest, under a contract of sale or other agreement whereby upon certain payment or payments the legal title is to be or may be acquired by such corporation, association, copartnership or individual, his or its interest in such real property shall be assessed and taxed as real property subject to the provisions of this subdivision. The interest of the United States, or of this state, in such property shall not be assessed or taxed and the assessing and taxing officers shall add to the assessment and tax rolls opposite the description of any such property a notation stating that such interest is not assessed or taxed; and every notice of sale or other process and every conveyance or other instrument affecting the title to any such property, consequent upon the nonpayment of any such tax, shall contain a statement that such interest is not sold or to be sold or affected. The interest in any such property of the corporation, association, copartnership or individual, which or who is in the use, occupation or possession thereof, shall be assessed and taxed in the same manner as if said corporation, association, copartnership or individual held the legal title to such property, except for the addition to the description of the words

'interest under contract,' or other appropriate words descriptive of the interest in the property so assessed.  Such assessment shall be at the full value of such property without deduction therefrom on account of the whole or any part of the purchase price, or other sum due on such property, remaining unpaid.  The classification of such property or any part thereof as real property for the purposes of taxation under this chapter shall not be affected by any provision of the contract or agreement under which the same is held.''

In obedience to the directions of this act, the assessors of the city of Buffalo, in making their annual assessment rolls for 1926, made the assessment complained of in this proceeding, and the question to be passed on by the referee is the validity and legality of such assessment.

The counsel for the city contends in substance that the assessment attached differs radically from the assessment made in 1921 and held illegal; that the assessment of 1925 is not an assessment against the property of the United States government, as was the case in that of 1921, but simply an assessment of the interest of the relator in the property; and that by the express provisions of the act of 1925 the interest or title of the United States can in no way be affected by such assessment or taxation, or by any proceedings taken to enforce the collection of the tax.  It is argued that the case presented is not unlike that of the owner of real property incumbered by a mortgage, where the owner of the land pays a tax on the land, although his equitable interest in it may in fact be less than the real value of the land.  It is urged, too, that the government simply holds the legal title to the property assessed. as security for the payment of the purchase price to be paid, and that in fact the real equitable interest of the relator is to be measured by the value of the property assessed.  In other words, the relator is in fact the equitable owner of the property, although the bare legal title remains in the United States.  It is, therefore, argued that, where the interest of the government is separate and distinct from that of the relator, the relator's interest is subject to taxation like other property.

If that were all there is to this case, the arguments advanced to sustain the assessment would have great force.  However, relator's counsel contends that the attempted taxation is illegal and void, because it is a tax on the legitimate functions of the National government in its right to acquire and dispose of property, and the State statute, in so far as it undertakes to interfere with that right, is void, and the assessment cannot stand.  Whatever may be said as to the nature of the interest acquired by the relator under its

contract with the government, in its last analysis the assessment and taxation directed by the addition to the Tax Law passed in 1925 is in effect a taxation of the contract made with the Federal government. We may speak of it as a taxation of rights or interests acquired under such a contract; but after all it is tantamount to taxation of and under the contract. May the State Legislature authorize such taxation for State or municipal purposes?

In discussing the question we start with the fundamental propositions laid down by the United States Supreme Court in *M'Culloch v. State of Maryland* (4 Wheat. 316) and followed in many later cases, that State governments have no right to tax any constitutional means employed by the Federal government to execute its constitutional powers, and that the States have no power, by taxation or otherwise, to retard, impede, burden or in any manner control the operations of the constitutional laws enacted by Congress to carry into effect the powers vested in the National government.

The history of the coking plant which is the subject of the contract of sale of June 30, 1920, shows it was built for the express purpose of enabling the United States government to obtain toluol used in the manufacture of explosives to aid the government in the prosecution of the war with the Central Powers of Europe in which it was then engaged. The cost of this construction was paid for by the government, and the plant by express agreement became and remained the property of the government. What the government did in this regard was in the exercise of the constitutional powers vested in it. The war terminated. The government had this property on its hands. It had the right to sell and dispose of the plant. This it agreed to do by and in the manner provided in its contract with the relator, dated June 30, 1920. The disposition of the plant was but an incident to its original building and creation, and so intimately related to it that we are of the opinion that such sale and disposition must be deemed a part and portion of the war measures adopted by the government for the prosecution of the war in which it had been engaged. In the liquidation and winding up of its affairs, the government is entitled to the same protection against illegal taxation as it is when the instrumentalities are actually employed in the prosecution of the war.

It has accordingly been held that, where a corporation was formed under the laws of this State to erect houses for the accommodation of those employed in the manufacture of things required in the prosecution of the war, and where the capital stock of the company was held and paid for by the United States, land acquired by such a corporation and houses built by it are not subject to assessment

or taxation by municipal authorities, although the war itself had ended. ( *United States Housing Corporation* v. *City of Watertown,* 113 Misc. 679.)

Does the authority attempted to be conferred by the amendment to the Tax Law of 1925 retard, impede or burden in any way the disposition of the plant agreed to be sold by the government to the relator? We are of the opinion it does. A very enlightening decision bearing on that question is that of our Court of Appeals in *People ex rel. Astoria Light, Heat & Power Co.* v. *Cantor* (236 N. Y. 417). In that case the relator entered into a contract with the government during the late war, by which it was to furnish buildings, labor and materials necessary for making gas masks, and in payment therefor was to receive an amount equivalent to the actual cost of such buildings, labor and material, plus a reasonable amount for certain overhead charges. It performed its contract, and as a result there was due to it from the government October 1, 1919, the sum of over $600,000, which rested in open account. The defendants included this amount among the taxable assets of the company, and it was assessed accordingly. A proceeding was brought to review the assessment. The defendants contended the amount due from the government was simply an indebtedness due from a solvent debtor and ordinary personal property assessable and taxable by the State. The court held to the contrary, saying: " We do not agree with this view. We think that the power of a State to tax the amounts becoming due under a contract with the Federal government like the one in question would hinder and embarrass the government in carrying out the powers conferred by the constitutional provisions above quoted. If we should assume that a State, carried away by some species of popular passion or some fatuous theory of Federal and State relations, could enact a law providing that the amount coming due to one of its citizens from the Federal government under such a contract as this should be taxed at fifty per cent of its amount we think no one could doubt that the Federal government would be hindered and embarrassed by such action in making contracts to enable it to carry on war. It either would not be able to get persons to take such contracts or it would be compelled to add to the amount of compensation to be paid to them the extra amount which the State proposed to take by way of taxation. Either result would be a handicap and a source of hindrance and in our judgment would clearly come within the abiding principles laid down in *M'Culloch* v. *State of Maryland,* 4 Wheat. 316 [4 L. ed. 579], and *The Banks* v. *The Mayor* [*New York*], 7 Wall. 16 [19 L. ed. 57]. The fact that the tax might be two per cent, instead of fifty per cent,

202 People ex rel. Donner-Hanna Coke Corp. v. Burke.

Supreme Court, October, 1926.                    [Vol. 128

would alter the amount of embarrassment but not the principle involved."

We think the views stated and applied in the case cited apply with even greater force to the facts existing in the case now in hand. If the government, in selling the coke plant to the relator or to any other party, was required to sell on the condition that the purchaser should pay taxes on the property agreed to be bought at its full value, notwithstanding the government retained title until the final payment was made, it follows as matter of course that such a purchaser would be unwilling to pay as large a sum for it as it would if the property bought were free from taxation. The Federal government under such conditions would be embarrassed in getting a price equal to the price it otherwise could obtain, and this would retard, impede and burden the National government in its operations, just as was held it did in the attempted taxation in the case of *People ex rel. Astoria Light, Heat & Power Co.* v. *Cantor* (*supra*).

If the indebtedness of the United States to a private corporation incurred in supplying munitions of war is exempt, then we are unable to see why the consideration agreed to be paid the government in purchasing property used for such purposes should not also be exempt. In each case taxation of such property, or the possession rights therein, hinders, burdens and impedes the operations of the government in its legitimate field, for the selling price is necessarily decreased just to that extent. In its final analysis the assessment and tax undertaken is an assessment and tax on the contract itself, the right to sell, and the price realized. It is true the amendment of the Tax Law of 1925 provides: " His or its interest in such real property shall be assessed and taxed as real property." But the relator's interest is only such interest as it acquires under and by virtue of the contract itself, and to tax such an interest is to tax the power and right of the Federal government to sell and dispose of its own property, and to deter contemplating purchasers from negotiating for it except at a reduced price.

This is all the more manifest when we consider that the mandate of the statute requires the assessors to assess the purchaser's interest not at the actual amount the purchaser may have paid on the contract still remaining executory, but at the full value of the property purchased. No deduction is to be made " on account of the whole or any part of the purchase price, or other sum due on such property remaining unpaid." If such interest is taxable, then it becomes the subject of assessment and taxation the moment the contract is made, although the purchaser may not have paid a dollar thereon.

The amendment of 1925 is an attempt under the guise of taxing an interest in the property to tax the property itself, and simply providing proceedings to collect and enforce such a tax shall not affect the government's interest. If, however, making the contract or the contract interest subject to taxation injuriously burdens or impedes the government in its operations in the sale of the property, then it cannot be said such taxation in no way affects the government's interest. These facts distinguish the case in hand from cases cited by the learned counsel for the city, where the right to tax an interest of individuals or corporations in property, the legal title to which was vested in the government, has been upheld. In such cases the interest taxed was separate and distinct from that of the government itself, and the question of the untrammeled right of the government to dispose of its own property to its best advantage was in no way involved.

We sympathize with the argument advanced by the corporation counsel that where property located within a city such as this enjoys the police and fire protection and other advantages incident to such location, it should in fairness bear its fair proportion of taxes. Of course the same argument might be advanced as to other government property, but the appeal to render such property liable to proper and equitable taxation lies rather to Congress than to the State Legislature. Mr. Justice BUTLER, of the United States Supreme Court, in the case of *Jaybird Mining Co.* v. *Weir* (—— U. S. ——), lays down broadly the rule that: "Without congressional consent, no Federal agency or instrumentality can be taxed by State authority."

As to the argument urged with force by respondents' counsel that the assessment is only against the equitable interest of the relator under the contract, it is well for the referee to call attention to the holding of the United States courts on the subject. In the case of *United States* v. *Canyon County* (232 Fed. 985) the interest of an entryman in certain lands was assessed by county officials in the State of Idaho. The District Court held such interest was taxable, the court stating: "The discussion of the substantive issues will therefore be upon the assumption that the county is assessing and proceeding against only the interest or equity of the entryman, exclusive of that of the government," and in that connection said the right to tax the first class of lands is not so clear. The legal title thereto remains in the government, the entrymen have not paid in full for their water rights, and they have not brought the requisite acreage under cultivation and irrigation. Still it must be apparent that they have something more substantial than a mere contingent interest. Upon proof of compliance with

the general homestead law and the issuance of a certificate to that effect, they became possessed of rights of which they can be divested only through their default or voluntary relinquishment. It is a vested interest which they have, and not a bare option to purchase when and if the government sees fit to sell. They not only have the full and exclusive use of the lands, but they may by assignment transfer them in whole or in part, and thus realize in money the entire value thereof. (Act of June 23, 1910; 36 U. S. Stat. at Large, 592; U. S. Comp. St. § 4727.) They may also mortgage, and the mortgagee may foreclose and protect himself by bidding at the foreclosure sale. (General Reclamation Circular of Sept. 6, 1913, p. 28.) On the death of the entryman his heirs succeed to his rights. If, then, the entryman has the valuable right of possession and use, and the unqualified power to acquire the legal title — in other words, if he has a vested interest, which may be sold, mortgaged, and inherited — it is difficult to see why it may not also be taxed without impairing or clouding the title of the United States or infringing upon its rights. The interest would seem to be quite as substantial as, and of equal dignity to, the right of the holder of an unpatented mining claim, and it has been repeatedly held that such a claim is taxable. (*Elder* v. *Wood,* 208 U. S. 226, and cases therein cited.)

The argument of the court in that case is plausible, and is the argument advanced by the respondents in this case. However, practically the same identical question on practically same facts came before the United States Supreme Court in the case of *Irwin* v. *Wright* (258 U. S. 219), where authorities in the State of Arizona assessed and taxed the " equity " of an entryman in reclamation lands, where the title to the lands still remained in the United States. The court held that such " equity " was not taxable. Chief Justice TAFT wrote the opinion of the court, and expressly disapproved the holding of the District Court in *United States* v. *Canyon County* (232 Fed. 985). In his opinion the chief justice said: " It is argued that it is not government property which is sought to be taxed here before final certificate, but only the interest of the entryman. In the case at bar, the taxes were in the first instance assessed against the land, but later the board of supervisors changed the form of the assessment so as to insert the word ' equity ' in the record. The power of the supervisors, under the Arizona statutes, to order such a change in past assessments, is challenged. We do not think it necessary to decide this. It is enough to say that the entrymen did not have the equitable title until they received the final certificate and their interest in the government's land, until that issued, was, for the reasons given, not taxable."

In considering and disposing of the case in hand we think consideration should be given to the fact that the act of 1925 authorizing assessment and taxation in cases like that in hand is an *ex post facto* law undertaking to make subject to assessment and taxation property theretofore exempt.  At least, it undertakes to authorize assessment and taxation where such right did not exist prior to its enactment.

The relator attacks the assessment on the further ground that the statute is unconstitutional and void, because it enacts an arbitrary and unreasonable classification.  It is argued that, assuming a right to tax the equitable interest of a purchaser such as the relator, the assessment as to amount should be only to the extent of such equitable interest.  In other words, to direct an assessment for the full value of the property agreed to be purchased, irrespective of the amount invested by way of payment or the purchase price, is an unreasonable and arbitrary direction condemned by law.  The evidence is that only five of the twelve annual installments called for by the contract of June 30, 1920, have been paid or are due, and if the interest of the relator is taxable at all it should be confined in amount to the real value of the investments and not measured by the total price agreed to be paid, or by the full value of the property agreed to be purchased.

The general rule is, in taxation, that " While the Legislature has wide latitude in classification, its power in that regard is not without limitation, for the classification must have some basis, reasonable or unreasonable, other than mere accident, whim or caprice." (*People ex rel. Farrington* v. *Mensching*, 187 N. Y. 8, 18.)

Such legislation violates section 1 of article 14 of the Amendments to the Federal Constitution, if it denies to the citizen the equal protection of the law.  In *Southern R. Co.* v. *Greene* (216 U. S. 400) the Supreme Court of the United States said: " While reasonable classification is permitted, without doing violence to the equal protection of the laws, such classification must be based upon some real and substantial distinction, bearing a reasonable and just relation to the things in respect to which such classification is imposed; and classification cannot be arbitrarily made without any substantial basis.  Arbitrary selection, it has been said, cannot be justified by calling it classification."

It is difficult to see how, under these rules, the assessment can be sustained.  The taxation of the property itself has been condemned, on the ground that it is owned by the United States.  Under the guise of taxing the interest of the relator, the law of 1925 nevertheless directs the assessment of such interest " shall be assessed and taxed as real property," and that " interest " " in the same

manner as if said corporation * * * held the legal title to such property," and at " the full value of such property without deduction therefrom on account of the whole or any part of the purchase price, or other sum due on such property, remaining unpaid." It would seem that the act came within the condemnation of the rules of law on the subject. If, however, the referee is right in his views that the interest sought to be reached is not taxable at all, because such taxation impedes and burdens the operations of the Federal government, then the question whether the statute is arbitrary and unreasonable in its provisions is of no consequence.

We reach, therefore, the conclusion that the assessment of improvements should be vacated and set aside. The assessment of the land itself to be in no way affected by this decision.