# IRWIN *v.* WRIGHT, COUNTY TREASURER OF MARICOPA COUNTY, STATE OF ARIZONA, ET AL.

APPEAL FROM THE DISTRICT COURT OF THE UNITED STATES FOR THE DISTRICT OF ARIZONA.

No. 110. Submitted January 24, 1922.—Decided March 20, 1922.

1. A suit to enjoin a public officer from enforcing a statute is personal and, in the absence of statutory provision for continuing it against his successor, abates upon his death. P. 222.

2. The Act of February 8, 1899, c. 121, 30 Stat. 822, does not authorize such revivor against state officers, nor does § 461 of the Arizona Civil Code. P. 222.

3. A suit against the members of a continuing public board, such as a board of county supervisors in Arizona, does not abate when members retire, and their successors may be substituted. P. 224.

4. Injunctive relief against collection of taxes unlawfully assessed on lands in Arizona and against future assessments, may be obtained in a suit against the Board of Supervisors of the county, in view of their functions under the Arizona law. P. 226.

5. Lands entered within a reclamation project are not subject to state taxation before the equitable title has passed to the entryman; and that title does not pass until the conditions of reclamation and payment of water charges due at time of final proof, imposed by the amended Reclamation Act, have been fulfilled in addition to the requirements of the Homestead Act. P. 226.

6. The Act of June 23, 1910, which permits entrymen within reclamation projects who have proved full compliance with the Homestead Law to assign in whole or in part to other persons, subject to the requirements of the Reclamation Act, was designed to enable entrymen, whose entries were cut down to smaller farm units prescribed by the Secretary of the Interior, to dispose of their surplus to others who would pursue the requirements of the Reclamation Act, and did not operate to subject such entries to state taxation. P. 231.

7. With respect to taxation, mining claims differ from other claims to public lands, in that the mining interest, with the right to appropriate the mineral, arises from discovery and location and is independent of patent. P. 231.

8. Reclamation entries are not taxable by the State as " equities " before the size of farm units has been fixed, or before the final certificates have been issued to the entrymen by the Government. P. 232.

Reversed. ·

APPEAL from a decree of the District Court dismissing a bill filed by the appellant, on behalf of himself and others in like situation, to enjoin the assessment and collection of state taxes on lands within a federal reclamation project.

Mr. Patrick H. Loughran and Mr. Ernest W. Lewis for appellant. Mr. M. J. Dougherty, Mr. G. A. Rodgers and Mr. F. H. Swenson were also on the brief.·

Mr.. James M. Sheridan, Mr. Geo. D. Christy, Mr. R. E. L. Shepherd and Mr. Joseph E. Noble for appellees.

MR. CHIEF JUSTICE TAFT delivered the opinion of the court. ·

The appellant Irwin, a citizen of California, filed his bill of complaint in the District Court against the Treasurer, the Assessor, the Attorney, the Sheriff, and the members of the Board of Supervisors, of Maricopa County, Arizona, citizens of Arizona. He averred that he had an interest, as a homestead entryman, under the General Homestead Act of Congress of May 20, 1862, c. 75, 12 Stat. 392, and the Reclamation Act of June 17, 1902, c. 1093, 32 Stat. 388, in land included within the Salt River Reclamation project in Maricopa County, that he had not fulfilled many of the conditions by him to be performed before the title to the land would vest in him, that meantime it was the property of the United States and not subject to taxation by a State, that he brought the suit in behalf of himself and also in behalf of other reclamation homestead entrymen within the Salt River Project in Maricopa County, and their assigns, similarly situated, desiring to

avail. themselves of the benefits of it, that the defendants had levied and assessed taxes against these homestead premises of plaintiff and the others in whose interest he sues, for several years, and had demanded payment of · them, and threatened to collect them by suit and sale of such lands, and to assess them in the future, that such ac-· tion was in contravention of Article IV, § 3, of the Federal Constitution, deprived him and his fellow entrymen of a privilege and immunity secured to them as citizens of the United States, deprived them of property without due process of law, and denied them the equal protection of the laws, all under the Fourteenth Amendment. He prayed for an injunction against the defendants and their successors in office and each of them as taxing authorities of Maricopa County from further assessing said lands, collecting the taxes already assessed, or bringing suit to collect the taxes as delinquent or to sell such interests. After answer and reply, the case was heard on an agreed statement of facts. The District Court dismissed the bill on its merits without opinion. This is a direct appeal from the District Court under § 238 of the Judicial Code, as amended January 28, 1915, c. 22, 38 Stat. 804, because the suit is one involving the construction or application of the Constitution of the United States.

On January 24th last, the cause was submitted to the court by counsel for the appellant upon brief, counsel for appellees not appearing. Since that day, a brief has been filed on behalf of appellees and considered by the court. When the case was called, counsel for appellant submitted a motion, suggesting that all the appellees, county officers of Maricopa County, Arizona, who at the time of bringing, hearing and deciding the suit below were charged with the duty of assessing and collecting taxes therein, had, with exception of the sheriff and one of the three members of the Board of Supervisors, retired from office, and that

their successors had been elected and qualified. These successors, the present officers of the county, the appellant asked to have substituted as appellees in this case. The motion was inadvertently granted. The order granting it must be in part vacated.

A suit to enjoin a public officer from enforcing a statute is personal and in the absence of statutory provision for continuing it against his successor, abates upon his death or retirement from office. *Pullman Co.* v. *Croom*, 231 U. S. 571. In *United States ex rel. Bernardin* v. *Butterworth*, 169 U. S. 600, substitution was refused, although consent was given by the successor in office. This court said (p. 605):

" In view of the inconvenience, of which the present case is a striking instance, occasioned by this state of the law, it would seem desirable that Congress should provide for the difficulty by enacting that, in the case of suits against the heads of departments abating by death or resignation, it should be lawful for the successor in office to be brought into the case by petition, or some other appropriate method."

In response to the suggestion, Congress passed the Act of February 8, 1899, c. 121, 30 Stat. 822, under which successors of United States officers who have been sued may be substituted for them upon proper showing. In *Caledonian Coal Co.* v. *Baker*, 196 U. S. 432, 442, it was held that the statute authorized such procedure in the case of a territorial judge appointed under a law of the United States. But no authority exists for the substitution of successors of state officers in such cases. We have examined the statutes of Arizona and find none in them. The Arizona Civil Code, 1913, contains the following:

" Sec. 461. An action shall not abate by the death or other disability of a party, or by the transfer of any interest therein, if the cause of action survive or continue. In case of the death or disability of a party, the court, on

motion, may allow the action to be continued by or against his representative or successor in interest. In case of any other transfer of interest, the action may be continued in the name of the original party, or the court may allow the person to whom the transfer is made to be substituted in the action."

This does not permit the substitution of a successor for a public official sued personally.

In the *Butterworth Case, supra,* it was sought to justify substitution under an act which read as follows:

" No action, brought or to be brought, in any court of this State shall abate by the death of either of the parties to such action, but upon the death of any defendant, in a case where the action by such death would have abated before this act, the action shall be continued, and the heir, devisee, executor or administrator of the defendant, as the case may require, or other person interested on the part of the defendant, may appear to such action."

This court said (p. 605):

" . . . We are unable to perceive that this statute, either in its terms or its spirit, is applicable to cases like the present one. Neither the heir, devisee, executor or administrator of a deceased official would have any legal interest in such a controversy. Nor, in the case of a resignation, could the successor be said to be ' a person interested on the part of the defendant.' "

What we have said applies to the motion for substitution so far as it relates to Sam F. Webb, sued as County Treasurer, C. W. Cummins, sued as County Assessor, and L. M. Laney, sued as County Attorney, and the order granting the motion as to them is vacated, the motion is denied and the cause is dismissed as against them without prejudice, of course, to new suits against their successors.

It may not be improper to say that it would promote ustice if Congress were to enlarge the scope of the Act

of February 8, 1899, so as to permit the substitution of successors for state officers suing or sued in the federal courts, who cease to be officers by retirement or death, upon a sufficient showing in proper cases. Under the present state of the law, an important litigation may be begun and carried through to this court after much effort and expense, only to end in dismissal because, in the necessary time consumed in reaching here, state officials, parties to the action, have retired from office. It is a defect which only legislation can cure.

J. G. Montgomery, county sheriff, still remains as appellee in the case but, as his taxing duties are only connected with the service of process in tax suits, it is doubtful whether, were he the only party here, an injunction against him would give the relief sought. It is not necessary to decide this, however, as will be seen from what follows.

So far as the order already entered substitutes for C. W. Peterson and W. K. Bowen sued as County Supervisors, C. S. Steward and Guy F. Vernon, who have been elected to be their successors, as appellees, it will stand, for the principle to be applied in their case is different. The rule requiring abatement of such suits against officials on their retirement and forbidding substitution of their successors, does not apply when they constitute a board, having a continuing existence. *Marshall* v. *Dye,* 231 U. S. 250; *Richardson* v. *McChesney,* 218 U. S. 487, 492; *Murphy* v. *Utter,* 186 U. S. 95. An examination of the statutes of Arizona as to the composition and duties of this board leaves no doubt that it is a continuing one. A county in Arizona is a body politic and corporate. Section 2388 of the Arizona Civil Code of 1913 provides that " its powers can be exercised only by the board of supervisors or by lawful agents and officers acting under their authority and authority of law." The Board has three members and is vested with very wide and varied powers, acting as a

Board.    Code, Title 10, c. IV.. Its members exercise
official duties only as members of the Board, and a quorum
of two may act.    Code, § 2408.    Every two years, either
one or two members are elected, but the retiring members
hold until their successors are elected and qualified.    Code,
§§ 2399, 2400.    The motion should be granted so far as
it asks the substitution in case of the two supervisors,
unless it appears that under the averments and prayer of
the bill an injunction against the Board of Supervisors
alone will not aid the plaintiff.    *Warner Valley Stock Co.*
v. *Smith*, 165 U. S. 28, 35, 36.    The bill prays an injunc-
tion against the collection of taxes already assessed for
each of twelve years and against future assessments.    Are
the functions of the Board of Supervisors such that an in-
junction against them would prevent such collection and
assessment?

Under the Arizona statutes the procedure in the assess-
ment and collection of taxes is that the county assessor
makes the original assessment roll against the owners, and
files it with the Board of Supervisors.    Code, §§ 4860, 4874.
The Supervisors or a majority of them constitute a board
of equalization, and revise the assessment roll and send it
to the State Board of Equalization.    Upon its return from
the state board, § 4892 provides that the Board of Super-
visors shall then proceed to assess taxes according to the
valuation specified in the assessment roll, and upon com-
pletion of such assessment, the chairman of the Board of
Supervisors shall annex to the roll a warrant commanding
the county treasurer to collect from the several persons
named in the roll the total taxes set opposite their respec-
tive names.

It is the duty of the Board of Supervisors to levy the
taxes, to direct all suits to which the county is a party,
to supervise the official conduct of all county officials
charged with assessing and collecting the public revenues,
to see that they discharge their duties faithfully, to di-

rect prosecutions, for delinquencies (Code, § 2418), to receive report of the treasurer and ex officio tax collector each year of delinquent lists of real estate taxes, to examine and compare them, and to correct them if any property therein reported is not subject to taxation, and to return them to the treasurer for collection (Code, §§ 4909, 4912), and to exercise the same authority with respect to the " back tax book " for previous years.

In view of these various duties of the Board of Supervisors not only in respect of the levying of future assessments but in the matter of correction and collection of delinquent taxes, it is clear that an injunction restraining the Board from future assessments on the lands in question, or from taking any steps to collect the back taxes, would be substantially to secure the relief the plaintiff seeks.

Coming now to the merits of the controversy, the point at issue is whether when the plaintiff and his fellows completed all that they had to do under the original Homestead Act to perfect their right to a patent, they had an equity against the Government which was taxable by the Territory of Arizona and its successor the State. On the pleadings and the agreed statement of facts, it is admitted that the plaintiff and his associates performed all the conditions under the Homestead Act and that they duly took all the preliminary steps enjoined under the Reclamation Act; but it is averred, and not denied in the answer of the defendants, that a number of important steps remained to be taken by plaintiff and those for whom he sues in perfecting their claims under the Reclamation Act at the times these taxes were levied, and in the case of the plaintiff and some of the class, at the time of bringing this suit.

Under the Homestead Act, Rev. Stats., § 2291, every person making a homestead entry was required among other things to establish a residence upon the tract of

land entered and maintain a residence thereon and culti-
vate it for a period of not less than five years, and to sub-
mit final proof thereof upon which patent ultimately
issued in due course, within seven years after the date of
entry. The act was amended June 6, 1912, c. 153, 37
Stat. 123, to reduce residence to three years. Under the
third section of the Reclamation Act, 32 Stat. 388, the
Secretary of the Interior is authorized to withdraw from
entry, except under the homestead laws, any public lands
believed to be susceptible of irrigation from the works
he is about to initiate, and all homestead entries on such
lands are made subject to all the provisions, limitations,
charges, terms and conditions of the Reclamation Act.
The act further provides (§ 5) that the entryman upon
lands to be irrigated from the government works shall, in
addition to compliance with the homestead laws, reclaim
at least half of the total irrigable area of his entry for
agricultural purposes, and before receiving a patent for
the lands covered by his entry shall pay to the Govern-
ment the charges apportioned against such tract as con-
tribution to the cost of the works. The Secretary is
authorized to fix a limit of area of land per entry repre-
senting the acreage which may reasonably support a fam-
ily. The Secretary is given full power in § 10 to make
rules and regulations needed to carry the act into effect.
He has done so. Under the act and the regulations con-
tained in the General Reclamation Circular, each entry-
man is required to conform his entry to a " farm unit "
established by the Secretary within each reclamation proj-
ect and this has forced many relinquishments and cancel-
lations of surplus land in homestead entries, leading to
remedial legislation hereafter mentioned. The entryman
is required to clear the land entered of brush and other
encumbrances, to provide the same with lateral ditches
for its effective irrigation, to grade the same and put it
into proper condition for crop growth, and to plant, water,

9544°--23----18

and cultivate, during the two years next preceding the time of filing his final affidavit, half of the irrigable area of his entry and to grow satisfactory crops thereon, i. e., crops equal to crops raised upon lands similarly situated. Upon final proof, a final certificate is issued to the entryman showing that he has performed all conditions precedent to acquiring the title. The patent which is the formal grant follows at the convenience of the Land Office and often is delayed. By the Reclamation Act, homestead reclamation entrymen were obliged to pay all water charges before a patent would issue, but the effect of subsequent legislation, in Acts of August 9, 1912, c. 280, 37 Stat. 267, of August 13, 1914, c. 247, 38 Stat. 686, and of February 15, 1917, c. 71, 39 Stat. 920, is to divide the water charges into instalments of varying percentages, falling due during a period of twenty years, from and after public notice by the Government that the water is ready for use, and to allow a patent upon payment of all instalments due at time of submitting final proof. If proof is satisfactory, a patent then issues, conveying a full legal title but reserving a prior lien to the Government, superior to all others, for all instalments unpaid.

The rule established by the decisions of this court is that, by virtue of its sovereignty and the constitutional power of Congress to dispose of and make all needful rules and regulations respecting the territory or other property belonging to the United States, no State can tax the property of the United States within its limits. This was recognized and enforced by the Enabling Act of June 20, 1910, c. 310, 36 Stat. 557, under which Arizona was, on February 14, 1912, admitted to the Union, for that act contained an express declaration that lands and property belonging to the United States or reserved for its use were exempted from taxation. *Van Brocklin* v. *Tennessee,* 117 U. S. 151, 168; *Wisconsin Central R. R. Co.* v. *Price County,* 133 U. S. 496, 504. An exception to this prin-

ciple, or rather its non-application, is recognized where the Government has by final certificate parted with the equitable title to a person subject to state taxation and retains only the legal title by its delay in issuing the patent. Not until the equitable title passes can the State tax the entryman, except in the case of mining claims (the reason for which we shall presently consider), and in cases in which express authority to tax is given in the statute. *Bothwell* v. *Bingham County,* 237 U. S. 642, 647; *Sargent* v. *Herrick,* 221 U. S. 404, 407; *Stearns* v. *Minnesota,* 179 U. S. 223, 251; *Northern Pacific Ry. Co.* v. *Myers,* 172 U. S. 589; *Hussman* v. *Durham,* 165 U. S. 144, 147, 150; *Wisconsin Central R. R. Co.* v. *Price County, supra; Northern Pacific R. R. Co.* v. *Traill County,* 115 U. S. 600; *Colorado Co.* v. *Commissioners,* 95 U. S. 259; *Railway Co.* v. *McShane,* 22 Wall. 444; *Railway Co.* v. *Prescott,* 16 Wall. 603.

The county authorities in this case were in error in supposing that an equitable title passed from the Government to the entrymen here, when the latter had fulfilled the requirements of the Homestead Act. Had their entries been controlled solely by that act, they would have been right. But, as we have seen, their entries were made under that act as supplemented and qualified by the Reclamation Act; and the latter expressly entails on such entrymen additional conditions which must be performed before an equitable title or a right to a patent is secured.

We are cited by counsel for appellees to an opinion of Judge Dietrich of the District Court of Idaho in a suit brought by the United States to enjoin Canyon County, Idaho, and its taxing officers from taxing lands or the interests of settlers therein in the Boise Reclamation project. *United States* v. *Canyon County,* 232 Fed. 985. The case involved two classes of lands. The first was of lands in which a patent had issued, conveying a fee in the land subject to a lien of the United States, superior to all

others, for future instalments of water rents. The second was of lands in which the conditions of the original homestead law had been complied with, but the entrymen had not paid in full for their water rights and they had not brought the requisite acreage under cultivation and irrigation. The court held that the interests of the patentees in the first, and of the entrymen in the second class of lands were taxable by the State. In the first ruling, we concur. The patent vested the full legal title in the entrymen. The fact that a lien was reserved on the face of the patent prior in right to all other liens for instalments of water charges to fall due in the future did not prevent this, and the giving patents indicated an intention on the part of the Government that it should be land of the entrymen and of course it became taxable as such. *Baltimore Shipbuilding & Dry Dock Co.* v. *Baltimore,* 195 U. S. 375.

With the second ruling, in which the District Court was sustained by a decision of the Supreme Court of Idaho, *Cheney* v. *Minidoka County,* 26 Id. 471, we can not agree. We can not reconcile it with the cases in this court which we have cited above. The District Judge relies on the Act of June 23, 1910, c. 357, 36 Stat. 592, which permits entrymen within reclamation projects, after having made satisfactory proof of residence, improvement and cultivation for the period originally required under the homestead law, to assign such entries or any part thereof to other persons. Such assignees, upon subsequently submitting proof of the reclamation of the lands and upon payment of the charges apportioned against the same as provided in the Reclamation Act may receive a patent, *"Provided,* That all assignments made under the provisions of this act shall be subject to the limitations, charges, terms, and conditions of the reclamation Act." By circular of the Secretary of the Interior, the entryman may mortgage his interest also. The argument is that this puts such an interest as the entryman has in the lands

in the same category as mining claims which have always been taxable. *Elder* v. *Wood,* 208 U. S. 226. We do not think that mining claims present a convincing analogy. The basis of the mining interest is discovery and location. These give full opportunity to the locator of the claim to take out the mineral, and, since the beginning, this right and interest never has been dependent for its enjoyment on patent, and so it has been taxable. *Forbes* v. *Gracey,* 94 U. S. 762. The rule has always been different in respect to other public lands as the numerous decisions of this court cited above show.

Even before the statute of 1910, a homesteader could mortgage his interest to help him in performing the conditions of earning his patent. *Mudgett* v. *Dubuque & Sioux City R. R. Co.,* 8 L. D. 243. The care with which the Government has thus framed its land policy to protect and encourage the homesteader is shown further in *Ruddy* v. *Rossi,* 248 U. S. 104, 105. The Government incurs heavy liability in providing water for these lands. It relies on the entrymen to reclaim them, thus finally achieving its sole object of adding arid tracts to the productive area of the country. In pursuit of this purpose, it has found the requirement that the entryman shall pay all his apportioned cost of the irrigation work before he gets title, too burdensome, and, as we have seen, the sum has been spread in instalments over twenty years, and his title is given him after he has reclaimed the land and paid the few early instalments due at that time. The Act of 1910 does not purport to subject these lands to taxation while the title is as yet unearned and its terms show that it is not intended to permit anything beyond what fairly falls within its express provisions. Its evident and sole purpose was to enable entrymen whose entries were cut down in area by the Secretary of the Interior in prescribing farm units to dispose of their surplus to others who would be able to hold it, fulfill conditions and secure a

patent, and avoid a relinquishment or cancellation of the surplus which had been the consequence before the act. This is apparent from an amendment to the Act of 1910 passed May 8, 1916, c. 114, 39 Stat. 65, and from the Report of the Committee or Irrigation of Arid Lands of the House of Representatives of the 64th Congress, 1st session, No. 127, upon which the amendment was adopted. To construe this remedial legislation, including the Act of 1910, which is only intended to lighten the task of the entryman in reclaiming the land and acquiring title, so as to impose on him the new burden of state taxation, is contrary to its plain policy. We think, therefore, that the reason for the rule, making the acquisition of the equitable title the line between non-taxability and taxability, is stronger in case of reclamation homestead entrymen than in the instances where, before the Reclamation Act, it always applied. Moreover, the confusion caused in the past by the taxation, when specifically permitted, of indefinite and inchoate interests of the beneficiaries of government land grants, should prevent an inference of the congressional intention to depart from the rule requiring an equitable title in the entryman before state taxation, unless a purpose to permit earlier taxation is express or strongly implied.

It is argued that it is not government property which is sought to be taxed here before final certificate, but only the interest of the entryman. In the case at bar, the taxes were in the first instance assessed against the land, but later the Board of Supervisors changed the form of the assessment so as to insert the word " equity " in the record. The power of the Supervisors, under the Arizona statutes, to order such a change in past assessments, is challenged. We do not think it necessary to decide this. It is enough to say that the entrymen did not have the equitable title until they received the final certificate and their interest in the Government's land, until that issued,

was, for the reasons given, not taxable. Whether an interest like that of the entrymen in land not belonging to the Government would be taxable property, we have no occasion to consider.

Of the taxes here complained of, those from 1907 until 1916 were levied before the Secretary of the Interior, in January, 1917, had fixed for this project a farm unit of 40 acres to which each entry must conform. Certainly until the area which the entryman could receive was ascertained, no equitable title could pass.

After the farm unit was established, the entryman had two years in which to fulfil the requisites of the statute. One of these, and as important as any, was the filing of the final affidavit showing that he had performed the conditions precedent to getting a patent, which he had to present to the land office for approval and final certificate, which, as we have said, gave him equitable title. From an exhibit to the bill, the accuracy of which is not controverted, it appears that of the class of forty-nine entrymen for whom the plaintiff sues, twenty-four received a final certificate in 1919, and that twenty-five, including the plaintiff, had not received a final certificate when the bill was filed. As to the former, assessment of all taxes assessed against them for the years 1907 to 1918, inclusive, was illegal, and the defendants, J. G. Montgomery, Sheriff, and J. W. Bradshaw, Guy F. Vernon and C. S. Steward, members of the Board of Supervisors, should be enjoined from taking any steps to enforce collection. As to the latter, collection of all taxes assessed prior to filing the bill, and all future assessments for taxes on their interests as entrymen until final certificate shall have been issued to them by the United States Government, will be illegal and the foregoing defendants should be enjoined accordingly.

The decree of the District Court is reversed, with directions to enter a decree in conformity with this opinion.

*Reversed.*