**A. T. JERGINS TRUST v. COMMISSIONER OF INTERNAL REVENUE.**

**COMMISSIONER OF INTERNAL REVENUE v. A. T. JERGINS TRUST.**

**No. 6768.**

Circuit Court of Appeals, Ninth Circuit.
Sept. 8, 1932.

Thomas R. Dempsey, A. Calder Mackay, Marc F. Mitchell, and George G. Witter, all of Los Angeles, Cal., for A. T. Jergins Trust.

G. A. Youngquist, Asst. Atty. Gen., Sewall Key, Andrew D. Sharpe, and Francis H. Horan, Sp. Assts. to the Atty. Gen. (C. M. Charest, Gen. Counsel, and Mason B. Leming, Sp. Atty., Bureau of Internal Revenue, both of Washington, D. C., of counsel), for Commissioner of Internal Revenue.

Before WILBUR and SAWTELLE, Circuit Judges, and NORCROSS, District Judge.

WILBUR, Circuit Judge.

Petitioner seeks to review the determination of the United States Board of Tax Appeals upon a determination by the Commissioner of Internal Revenue proposing deficiencies in income taxes for the calendar years 1922, 1923, and 1924. The Board of Tax Appeals rejected the contention of the petitioner that it was exempt from income tax, and sustained its contention with reference to the manner of the determination of the depreciation and depletion items. Petitioner appeals from the former, and the Commissioner from the latter, part of the decision. If the contention of the A. T. Jergins Trust is sustained, it will be unnecessary to consider the Commissioner's petition. We will refer throughout to the A. T. Jergins Trust as "the petitioner," and to the Commissioner of Internal Revenue as "the respondent" or "the Commissioner."

The facts are stated in the opinion of the Board of Tax Appeals, and are not in dispute. We will state the salient facts and

refer to the findings of the Board of Tax Appeals for a more detailed statement.

In 1911 the city of Long Beach issued bonds, and with the proceeds thereof purchased the water system which had theretofore been furnishing the city and the inhabitants thereof with water. It is stated in the opinion and emphasized in the brief on behalf of the city that the acquisition of this waterworks was made necessary by reason of the unsanitary condition of the water mains and pipe lines resulting from rust and decay which permitted the water to escape, and, after becoming contaminated, to return to the pipes of the distributing system. We mention this fact, but attach no importance to it. Among the assets thus purchased by the city was a tract of 600 acres of water-bearing land. This land was the source of all the water used by the city's distributing system. The water was obtained by sinking wells to a subterranean supply. Part of the water procured and distributed was used for fire protection. Some years later oil was discovered in the vicinity of the water-bearing land of the city, and later oil was successfully developed and produced upon said land. On April 11, 1922, the city, as lessor, entered into a lease with the petitioner for about 140 acres of its water-bearing land, which was then, and is still, used for the procuring of water for the city and its inhabitants. It is sufficient, with reference to this lease, to state that it is an ordinary lease for the development of oil, providing that the oil produced by the lessee should be divided in the proportion of 40 per cent. to the city and 60 per cent. to the lessee. The lessee was required to pay all the expenses of exploration and development. With reference to the payment of taxes, the lease stipulated as follows:

"Taxes: The lessee shall pay all taxes and assessments which are levied or assessed upon any property which it may place on the said above described lands during the term hereof; and/or upon the oil or other hydrocarbon products stored on said lands by the lessee and not belonging to the lessor, and upon the mineral rights and interest of the lessee in said lands. All charges, taxes and assessments imposed by the state of California, United States of America, or any political subdivision of either thereof, upon said lands, or upon any part or parcel thereof, except upon the improvements placed thereon by the lessee, shall be paid in the following proportions: Forty (40%) per cent thereof by the lessor, and sixty (60%) per cent thereof by the lessee; provided, however, that the lessee shall at its sole and exclusive expense, pay and discharge all fees which are now or may hereafter be required to be paid by the state of California through the State Mining Bureau and the office of the State Oil and Gas Supervisor, or through such other department of the state of California which may be created for that purpose by legislative enactment."

The surface of the land is used for a variety of purposes. In connection with the water system, the city employed about 50 men whose headquarters were on the 600 acres. It maintains thereon a pumping plant, service department, blacksmith shop, salvage yard, a garage and residence, all of which are used in connection with the water plant. In addition to two oil and gas leases, of one of which petitioner is the lessee, the said tract of 600 acres has on it about 60 tenants who hold under leases or permits from the city. The business of these tenants includes airplane repair, hangars for aircraft, oil-well supplies, telephone, storage plants, cracking plants, oil-skimming plants, dehydration plants, gasoline absorption plants, and farming. These leases and permits were then and are of a temporary nature; can be terminated on short notice; and are made subject to the right of the city to use the property for water purposes. While a large amount of revenue has been derived by the city from its water-bearing lands as royalty upon the oil produced therefrom, it is clear that such production is altogether incidental to the main purpose and use of the land. We are not, therefore, dealing with a purely business venture in which the city, for the mere purpose of producing revenue for its treasury, engages upon business entirely distinct from its governmental functions.

The general principles with relation to the right of the federal government to tax the instrumentalities of the state, and vice versa, are well settled, and have been applied in a great many cases by both state and federal courts. The only difficulty is in the application of these general principles to the unique situation shown by the record in the case at bar. We are not, however, left solely to the application of these general principles for the determination of the questions involved in this case. The Supreme Court has recently had occasion to consider a number of similar leases and to determine the right of the state or federal government to tax the income derived therefrom by the lessee. In the most recent of these cases, de-

cided April 11, 1932, Burnet v. Coronado Oil & Gas Co., 285 U. S. 393, 52 S. Ct. 443, 444, 76 L. Ed. 815, the Supreme Court passed upon the power of the federal government to tax such proceeds derived from school lands belonging to the state of Oklahoma, and held that the federal government had no power to tax such income so derived. In this opinion the Supreme Court affirmed the decision of the Court of Appeals of the District of Columbia (60 App. D. C. 233, 50 F. (2d) 998) reversing a decision of the Board of Tax Appeals (14 B. T. A. 1214) which sustained the Commissioner of Internal Revenue in the assessment of income taxes upon income so derived by the lessee. In the case at bar the Board of Tax Appeals predicated its conclusion in part upon its own decision in the Coronado Oil & Gas Company v. Commissioner, subsequently reversed by the Supreme Court in Burnet v. Coronado Oil & Gas Company, supra. One of the first cases dealing with this subject is Gillespie v. Oklahoma, 257 U. S. 501, 42 S. Ct. 171, 66 L. Ed. 338. A similar problem was presented in Group No. 1 Oil Corporation v. Bass, 283 U. S. 279, 51 S. Ct. 432, 75 L. Ed. 1032. It must be taken as established by Gillespie v. Oklahoma, supra; Burnet v. Coronado Oil & Gas Co., 285 U. S. 393, 52 S. Ct. 443, 76 L. Ed. 815, that, where oil is thus produced from land held by the state or nation for governmental purposes, the income thus derived from the land of the state or nation cannot be taxed by the nation or state, respectively. This is conceded by the Commissioner. In the case of Gillespie v. Oklahoma, supra, the lands in question were held in trust by the federal government for the Indians. Oil leases of these lands were entered into by the government in pursuance of its trust. In the case of Burnet v. Coronado Oil & Gas Co., supra, the lands were public school lands donated by the federal government to the state government for the purpose of maintaining schools, and the proceeds derived from the sale of oil therefrom by the state were utilized for this confessedly governmental purpose. The Commissioner contends, however, that the city of Long Beach, in engaging in the business of procuring water for its inhabitants and incidentally in procuring income from its water-bearing lands in the shape of oil royalties, was acting in a proprietary, rather than in a governmental, capacity, and that, therefore, the constitutional principles which prevent the taxation by the nation of the property of a state or municipality do not apply to the taxation of such an enterprise so conducted. If

this argument were valid, it would seem equally applicable to the taxation of the water-bearing and oil-bearing land and to the portion of the income derived by the city therefrom by the sale of its proportion of the royalty oil, that is to say, if the taxes were constitutional, permissible because they do not interfere with the sovereign rights of the state exercised through a municipality because the municipality was not acting in a governmental but in a proprietary capacity, the right of taxation would exist as to the property itself and the income derived therefrom, provided, of course, that appropriate legislation were adopted for the direct taxation of land. As we understand it, it is not contended by the Commissioner that the 40 per cent. royalty paid to the city is taxable as income derived by it from its lands held in a proprietary capacity, nor, indeed, do we see how such a claim could be made in view of the early decision of the Supreme Court of the United States in U. S. v. Baltimore & Ohio Ry. Co., 17 Wall. 322, 21 L. Ed. 597, wherein the Supreme Court held that the revenue derived by a state from bonds of the Baltimore & Ohio Railway Company, owned by it, were not taxable by the federal government, although the bonds were issued to the city to secure the repayment to the city of $5,000,000 loaned by the city to the Baltimore & Ohio Railway Company, to enable it to extend its facilities for transportation with a view of aiding the city in securing a portion of the commerce flowing from the West to the East. The general purpose of the city of Baltimore in purchasing the bonds of the Baltimore & Ohio Railway Company was much less closely related to the governmental functions of the city than the acquisition by the city of Long Beach of water-bearing lands and a water-distributing system for the inhabitants thereof, and for their fire protection. In Pollock v. Farmers' Loan & Trust Co., 157 U. S. 429, 15 S. Ct. 673, 39 L. Ed. 759, the Supreme Court had under consideration the validity of the income tax law in two aspects pertinent to the considerations involved in the case at bar. The first one involved the question as to whether or not the tax upon the income derived upon real estate was a direct tax upon the real estate, and therefore required by the Constitution to be apportioned among the states in proportion to the population thereof. Chief Justice Fuller, in discussing that question, stated, at page 580 of 157 U. S., 15 S. Ct. 673, 689, 39 L. Ed. 759: "Unless therefore, a tax upon rents or income issuing out of lands is intrinsically so different from

a tax on the land itself that it belongs to a wholly different class of taxes, such taxes must be regarded as falling within the same category as a tax on real estate eo nomine. The name of the tax is unimportant. The real question is, is there any basis upon which to rest the contention that real estate belongs to one of the two great classes of taxes, and the rent or income which is the incident of its ownership belongs to the other? We are unable to perceive any ground for the alleged distinction. An annual tax from the annual value or annual user of real estate appears to us the same in substance as an annual tax on the real estate, which would be paid out of the rent or income. This law taxes the income received from land and the growth or produce of the land. Mr. Justice Paterson observed in Hylton's Case [3 Dall. 171, 1 L. Ed. 556], 'land, independently of its produce, is of no value,' and certainly had no thought that direct taxes were confined to unproductive land."

In dealing with the question of tax upon the income derived from municipal bonds, it is held in the same case that such a tax is in effect a tax on the power of the states and their instrumentalities to borrow money, and consequently repugnant to the Constitution. This would be true, of course, regardless of the purpose for which the bonds were issued and without reference to the question of whether or not the bonds were issued by the city or state for the purpose of acquiring property to be held by it in its proprietary rather than governmental capacity. These views were adhered to by the Supreme Court on rehearing, 158 U. S. 601, 15 S. Ct. 912, 39 L. Ed. 1108. It is thoroughly established that the public lands of the United States which are held by it in a proprietary capacity are not taxable by the state. Irwin v. Wright, 258 U. S. 219, 228, 42 S. Ct. 293, 66 L. Ed. 573; Van Brocklin v. Tenn., 117 U. S. 151, 6 S. Ct. 670, 29 L. Ed. 845; Wisconsin Central R. R. Co. v. Price County, 133 U. S. 496, 10 S. Ct. 341, 33 L. Ed. 687; Lee v. Osceola, etc., Imp. Dist., 268 U. S. 643, 644, 645, 45 S. Ct. 620, 69 L. Ed. 1133. It is clear, we think, that a tax by the federal government upon land owned by the city, whether in its proprietary or governmental capacity, would be unconstitutional, and that a tax upon income derived by the city from lands held in a proprietary or governmental capacity would be equally obnoxious to the Constitution. It may be, however, that, in dealing with the rights of third parties who have obtained income from city lands, a distinction may be drawn between income derived from lands held in a governmental capacity and those held in a proprietary capacity. This seems to be indicated by the Supreme Court in Burnet v. Coronado Oil & Gas Co., supra, in which Mr. Justice McReynolds, speaking for a majority of the court, said: "We are disposed to apply the doctrine of Gillespie v. Oklahoma strictly and only in circumstances closely analogous to those which it disclosed."

In denying the power of the federal government to tax the income derived from the school lands of the state of Oklahoma, he said: " * * * That to tax the fruits of the lease would burden her in the performance * * * of maintaining such schools."

No case, however, is cited by the Commissioner sustaining a similar tax upon the ground that the property involved was held by the state or its instrumentalities in a proprietary, rather than a governmental, capacity. The Commissioner relies upon the decision of South Carolina v. United States, 199 U. S. 437, 26 S. Ct. 110, 59 L. Ed. 261, 4 Ann. Cas. 737, dealing with the power of the federal government to require the payment of a license fee from the dispensaries of alcoholic liquor and holding that such payment might be exacted notwithstanding the fact that the dispensaries were acting for and on behalf of the state and derived no profit therefrom. Justice Brewer, who wrote that decision, was careful to point out therein (p. 458 of 199 U. S., 26 S. Ct. 110, 115, 59 L. Ed. 261, 4 Ann. Cas. 737): " * * * That the tax is not imposed on any property belonging to the state, but is a charge on a business before any profits are realized therefrom."

The Commissioner also relies upon the decision of the Supreme Court in Salt Lake City v. Hollister, 118 U. S. 256, 6 S. Ct. 1055, 30 L. Ed. 176, but in that case the constitutional power of the federal government to tax a city engaged in distilling liquors was not discussed.

That the city will apply the revenue derived from its proportion of the oil produced from its land to municipal purposes must be assumed, as it has no authority to apply such funds to any other purpose; that the amount of this fund will be diminished to some extent by the requirement that the lessee pay a tax upon its income derived from the sale of its proportion of the oil is as clear in the case at bar as in those cases wherein the right of the federal or state government to tax proceeds from publicly owned oil lands has been denied. We there-

fore conclude that the attempt to impose a tax upon the income of the petitioner as lessee of the lands of the city of Long Beach is unauthorized, and that the order of the Board of Tax Appeals must be reversed, and the determination of the Tax Commissioner fixing a deficiency tax set aside.