LAUGHLIN v. NORTH WISCONSIN LUMBER CO. et al.   SAVAGE v.

LAUGHLIN.   LAUGHLIN v. SAVAGE.

(Circuit Court, W. D. Wisconsin.  February 25, 1910.)

Nos. 13 D, 17 D.

1. VENDOR AND PURCHASER (§ 54*)—RELATION OF PARTIES.
    Under the Wisconsin law, pursuant to a contract for the sale of land
the vendee is the equitable owner in fee, and the vendor holds the legal
title as security for the unpaid balance of the price as a quasi mortgagee
entitled to strict foreclosure on default.
    [Ed. Note.—For other cases, see Vendor and Purchaser, Cent. Dig. § 85;
Dec. Dig. § 54.*]

2. VENDOR AND PURCHASER (§ 193*)—RIGHT TO POSSESSION.
    The vendee, or his assignee, under a contract for the sale of land has the
right to possession and the right to sell standing timber on the land, sub-
ject to the vendor's right to restrain the cutting of the timber if his se-
curity would be thereby impaired.
    [Ed. Note.—For other cases, see Vendor and Purchaser, Cent. Dig. §
401; Dec. Dig. § 193.*]

3. VENDOR AND PURCHASER (§ 101*)—CONTRACT—ASSIGNMENT—FORFEITURE—
    NOTICE—FORECLOSURE.
    Where a vendee of certain timber land under a contract providing for
future payments in installments assigned the contract to complainant, and,
while still interested in the purchase price to the extent of $600 commis-
sions, confederated with a prospective purchaser of the timber, and, as-
certaining that complainant was in default, paid the balance of the price
with money obtained from such prospective purchaser and obtained a deed
from the vendor, and then, by an ambiguous notice of forfeiture to com-
plainant, deprived him of nearly half of the 30 days to which he was en-
titled after notice in which to make payment and save his rights, such ven-
dee was not entitled to forfeit complainant's interest under such notice,
but, complainant not having been substantially injured thereby, the vendee
was entitled to enforce a strict foreclosure of the contract.
    [Ed. Note.—For other cases, see Vendor and Purchaser, Cent. Dig. §§
171, 173; Dec. Dig. § 101.*]

4. VENDOR AND PURCHASER (§ 212*) — RIGHTS OF VENDOR — CONVEYANCE OF
    TITLE.
    A vendor, by having executed a contract of sale. does not deprive himself
of the right to convey the fee, entitling his grantee to all the vendor's
rights in the land subject to the contract.
    [Ed. Note.—For other cases, see Vendor and Purchaser, Cent. Dig. §
436; Dec. Dig. § 212.*]

5. VENDOR AND PURCHASER (§ 212*) — CONVEYANCE TO THIRD PERSON — PAY-
    MENTS BY VENDEE.
    Where an owner of land, after having executed a contract of sale, con-
veyed it to a third person, the contract holder should pay subsequent in-
stallments of the price to the grantee.
    [Ed. Note.—For other cases, see Vendor and Purchaser, Cent. Dig. §§
436, 439; Dec. Dig. § 212.*]

In Equity.  Bill by Henry D. Laughlin against the North Wisconsin
Lumber Company and John H. Savage to restrain defendant Savage
from forfeiting complainant's contract of sale, consolidated with a bill
by Savage against Laughlin to quiet title, and with a cross-bill by

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Laughlin against Savage for similar relief. Decree for complainant on his original bill, and decreeing a strict foreclosure of complainant's contract of sale, on terms.

Randolph Laughlin and Defrees, Brace & Ritter, for Laughlin.
Clapp & Macartney, for Lumber Company.
Stiles W. Burr and Harold Harris, for Savage.

SANBORN, District Judge. Complainant is the equitable owner of 1,023.41 acres of land in Bayfield county, Wis., and the defendant Savage is the owner of the legal title, all subject to a certain easement of flowage and highway servitudes, and excluding certain mineral and oil rights. The original bill was brought to restrain Savage from forfeiting complainant's contract of sale, and Savage's bill (filed in the state court, and removed to this court) was to quiet the title to the same lands. It alleged legal title in Savage, that the possession was vacant, and that Laughlin made some claim which should be held void. The cross-bill in the removal suit to quiet title set up the same matters as alleged in the original bill. The supplemental bill alleged that part of the timber on the lands had burned up pending suit, and that Savage was liable for the value of the burned timber by reason of his wrongful intermeddling shown in the original and cross-bills, through which complainant's right to pay up and obtain title was defeated.

The North Wisconsin Lumber Company was the original owner of the lands, with its general office at Hayward, Wis., afterwards moved to Chippewa Falls. January 15, 1904, it sold the lands by written indenture, sealed by both parties, to Savage for $9,210.69, of which $2,046.82 was paid down, the balance due in five annual installments of $1,430 each, January 15th of each year from 1905 to 1909, with interest at 6 per cent. If the deferred payments should be made punctually, one-sixth of the interest was to be abated. Savage covenanted to pay the deferred sums and taxes imposed after January 1, 1904; and he also had an interest in the deferred payments by way of rebate for about $600 on account of commissions. The vendor covenanted to convey by warranty deed upon full performance, to Savage, his heirs and assigns. In case of any default (the times of payment, and payment of taxes, being declared as of the essence of the contract), the vendor should have the right to declare the contract null and void on 30 days' notice to Savage or his assignees. If default continued after the 30 days, Savage's interest should utterly cease and determine, without any right of Savage, his heirs or assigns, to reclaim or redeem, with the vendor's right to convey, with all improvements, free and clear from any claim of Savage, his heirs or assigns. The notice was to be served personally or by mailing it at Hayward, directed to Savage at his address in St. Paul. Assignments were provided for; no assignment should be valid unless indorsed, and countersigned by the vendor's secretary. There was no express transfer of the right of possession, but it was contemplated that the vendee or his assignees might make improvements; and complainant, the assignee and present owner of the contract interest, had some 12 years

before taken possession of a small island in a large lake situated near the land, not actually described in the contract, but being part of the contracted lands by reason of not being surveyed or meandered, and built a summer home thereon, at a considerable expense. He claims title to this island also by an independent title by estoppel, through the payment by him of the expense of certain improvements of the shore made by the vendor. Complainant is a lawyer, though for some years not in actual practice, and was formerly a judge in Missouri. He is a man of ability and considerable estate.

Savage assigned the contract May 12, 1904, to C. H. Norton and H. P. Norton, who assigned to Laughlin April 7, 1905. The vendor consented to both assignments, without exempting Savage from any of his covenants. The stipulated payments were made except for 1907, 1908, and 1909, and except taxes for 1906 and 1907. By inadvertence Laughlin failed to pay the installment falling due January 15, 1907; but on January 14, 1908, he sent his check for the 1908 installment to the vendor, which was returned to him because a deed of the land had been made to Savage. In the letter sending the check Laughlin offered to pay the 1907 installment and the taxes.

Under the Wisconsin law the relations of the parties to the contract were as follows: Laughlin was the equitable owner in fee, and the vendor held the legal title as security for the unpaid balance of the purchase price, being a quasi mortgagee, entitled to strict foreclosure on default. Church v. Smith, 39 Wis. 492. The vendor also had the right to forfeit on 30 days' notice. The contract having by necessary implication given the jus possessionis, the vendee or his assignee was the equitable owner. Martin v. Scofield, 41 Wis. 167. Such ownership includes the standing timber. Judge Laughlin had the right to sell this timber and give a good title to it. Northrup v. Trask, 39 Wis. 515; Krakow v. Wille, 125 Wis. 284, 103 N. W. 1121. But the vendor might restrain the cutting of the timber if its security would be thereby impaired; its rights being analogous to those of a mortgagee.

In the fall of 1907, Judge Laughlin had negotiations with John E. Glover, representing the Willow River Lumber Company of New Richmond, Wis., and with Paul Vogt & Co. of Milwaukee, looking to the sale of the timber. Glover offered $10,000 for the timber, by letter to Laughlin written December 2, 1907; but Laughlin did not accept because the offer did not agree with previous negotiations between them, and because he became suspicious of Glover's good faith in the matter. But the timber was not sold, though Laughlin claims it would have been but for Savage's wrongful interference, set out later in detail. In October, 1908, a considerable part of the timber was destroyed by forest fire. By the supplemental bill, filed May 4, 1909, Laughlin seeks to hold Savage liable for the value of the timber, by reason of such alleged wrongful interference; but it was announced by Laughlin's solicitor during the taking of the testimony in Chicago, April 30, 1909, before the supplemental bill was filed, that complainant did not expect to obtain a judgment against Savage or any one else for damages for the loss of the timber; and that the only claim or contention in that regard was that the loss was an equity which the court should consider as against Savage, in connection with whatever equities he

might urge against Laughlin. This statement was made as part of a stipulation in lieu of proof, in respect to the value of the timber destroyed by the fire, fixed in the stipulation at $5,200.

In regard to the negotiations with Vogt for the sale of the timber, Vogt made a conditional verbal offer for it, and he and Judge Laughlin were to look it over later; but nothing came of it because Laughlin called the matter off, telling Vogt, after Savage had obtained his deed from the North Wisconsin Company (as stated later), that Glover had stolen the land, and he could do nothing further about the sale until the title could be straightened out.

Complainant's equities depend wholly on Savage's conduct in his purchase of the land from the North Wisconsin Company, and it therefore becomes necessary to make a careful examination of his acts. Savage was the original vendee in the land contract, as well as in two others of a like nature. He had covenanted to pay the purchase price, and was interested in the money still due to the extent of $600. In the fall of 1907 he learned that Laughlin and Glover had been negotiating for the sale of the timber, and also that Laughlin had not made the 1907 payment on the contract. He had been for several years the attorney for Glover as to a railroad owned by the latter in the vicinity of the lands. Presumably he knew what the value of the timber was, as he often visited that section of country. The financial "slump" of 1907 was then getting to an acute stage, so that it may have occurred to him that Laughlin might be unable to raise the $3,000 necessary to make the payments of 1907 and 1908. While there is no direct testimony that he entered into a conspiracy with Glover to get a deed for the land, and then forfeit the contract if Laughlin could not pay up in 30 days, after which he would sell the timber to Glover and thus realize a good profit—while the evidence does not expressly show such a scheme—there are some circumstances which lend considerable probability to this theory. Savage did not have the ready money to pay the balance due the North Wisconsin Company, but Glover had it through his control of the Willow River Lumber Company. So it was arranged between them that the company should furnish Savage the money, some $4,200, and, if he should obtain full title to the timber, Glover was to buy it at a price to be agreed on. If the price was $10,-000, Savage would thus gain nearly $6,000 by the venture. Nothing was said between them as to what should happen if they were unable to agree on the price of the timber, nor was any note or other evidence of debt taken, except a check drawn by the company and payable to Savage. No charge was made on the company books against Savage for the money when it was later advanced; but it was entered as a debit item in the "Stumpage and Land" account, apparently in the same manner as a cash purchase of stumpage would have been. Other circumstances bearing on Savage's intent are that he was under covenant to pay the purchase price to the North Wisconsin Company, and had a $600 interest in that price, which would be two reasons why he might properly be desirous of getting the title. But these reasons are somewhat weakened by the fact that there were two other outstanding contracts, each presenting the same situation, but he made no attempt to acquire the legal title to either of these. Moreover, on Oc-

tober 4, 1907, two months before Glover made Judge Laughlin the offer of $10,000 for the timber, Savage wrote the attorney of the North Wisconsin Company that Laughlin had sold the timber to Glover, which representation was untrue and evidently made to induce the company to deed the land to Savage, and thus put an end to further trouble and annoyance. The company wrote Glover October 24, 1907, notifying him that until the contract should be fully paid up the purchaser had no right to sell the timber, and that if it were sold they would look to the purchaser for its value. Glover did not answer this letter. Under all these circumstances, it may fairly be inferred that the purchase of the land by Savage was a scheme between him and Glover to forfeit Laughlin's interest, and thus make a good thing between the two of them. But whether there was anything fraudulent or injurious to Laughlin in this is another question.

Savage having in October proposed to the North Wisconsin Company to convey the land to him on payment of the balance remaining due, this was, after considerable correspondence, carried out, and a warranty deed, drawn in conformity with the contract, was delivered to Savage December 23, 1907; the consideration of $4,261.43 being paid with the Willow River Company's check above mentioned. Shortly after, and on January 4, 1908, Savage gave written notice to Laughlin that if he failed to pay up in 30 days his contract rights would become forfeited. He did not recite in the notice that he had purchased the lands from the North Wisconsin Company, nor did the body of the notice show any reason why he should be giving it. The only clue furnished was the signature, in which Savage was described as grantee, with the words "North Wisconsin Lumber Company" immediately below, thus leaving it in doubt whether it was Savage's notice, or one given by him and the company jointly. Nor did Savage's letter accompanying the notice throw any further light upon the matter. Laughlin did not know what was intended, as his letter of January 10, 1908, shows. His later letter to the North Wisconsin Company, inclosing check for the January installment, calls for information on this point; but the reply did not give the facts, simply stating that they had assigned the contract to Savage. Savage wrote Laughlin again on January 18, 1908, finally stating that he holds a warranty deed of the lands from the North Wisconsin Company. Thus Laughlin was at last informed how it happened that he got the notice from Savage. Half of the 30 days had thus been lost through Savage's lack of frankness and evident purpose to enforce a forfeiture without allowing the stipulated time. Judge Laughlin made a request for further time, but it was denied. For some reason, which Savage testifies was inadvertence, the deed was not filed for record until February 4, 1908, shortly after this suit was brought. Laughlin suspected that the whole performance was a scheme of Glover's to forfeit the contract and prevent his paying for the lands, and upon this theory he brought suit. He examined in the register of deeds' office at Washburn to learn if any deed had been lodged for record, but could find none. He even arranged to have a telegram sent to him at Madison (where he went to begin suit) up to 4 p. m. of January 31, 1908, if any deed should be recorded. There is no doubt that Judge Laughlin

strongly suspected fraud, and that he and his able counsel felt amply justified in bringing suit to restrain the recording of the deed, and to prevent the threatened forfeiture. Nor is there any question that Savage's course was most ill advised, and clearly adapted to induce Laughlin's belief that there was on foot a plan to injure him. Such conduct unfairly cut down the stipulated 30-day period, to the whole of which Laughlin was justly entitled, and operated to waive that clause altogether.

The real question, however, is whether Judge Laughlin was injured, or his equitable ownership in any way substantially impaired, by Savage's inequitable conduct. Was his right to pay up made doubtful or confused to such a degree as to render payment unsafe? Did Savage or Glover through Savage take anything away from his ownership of the timber, or prevent the sale of it? Savage's arbitrary action in respect to the attempted forfeiture diminished the period of redemption from 30 days to 14, and for that he has been obliged to defend this suit, and should perhaps be charged with costs; but did such action really affect Laughlin's right, or do more than destroy Savage's technical power of forfeiture?

In respect to the contract right of payment, Laughlin was informed by the letter of January 16, 1908, from the North Wisconsin Company, that he was to pay Savage, and two days later he was told by Savage's letter that Savage held a warranty deed of the land. Was not Judge Laughlin thus sufficiently protected in his right of payment? Every purchaser of land by executory contract knows that the vendor has the jus disponendi. The land is not made inalienable merely by contracting to sell it. In case of a transfer the vendor has no right to receive the money if the vendee knows of the conveyance. If he pays the vendor, he may have to pay again. Judge Laughlin had the erroneous notion that his contract authorized him to pay the North Wisconsin Company, after the deed was given, and that he was also entitled to a warranty deed directly from it when he should pay up. But they had warranted the title in the deed to Savage, and this warranty would run with the land to Laughlin when Savage should convey to him, so that Laughlin would get the covenants of both. Another mistake was Laughlin's idea that the reservation of an undivided half of mineral and oil rights in the deed to Savage, added to a like reservation in Savage's proposed deed to him, would reserve the whole of such rights. These illusions had some influence in the bringing of the suit. Moreover, Savage had the lawful right to buy the land, and to get the purchase money from Glover. The North Wisconsin Company had the lawful right to sell the land, and convey it to Savage or anybody else. Suppose Savage did act with the hope and purpose of crowding Laughlin to give up his interest, where is the real injury? It is a clear case of damnum absque injuria.

Like considerations apply to the right to sell the timber. No real injury was inflicted. Judge Laughlin had this right just as fully after Glover "stole the land" as before. The deed to Savage in no way affected any legal or equitable right or interest previously existing. Laughlin's calling off the Vogt sale because Glover had stolen the land was simply a feat of imagination, for his real right and interest were

exactly as before. He had the theoretical right to sell the timber, but might be hampered by the legal owner, who might think his security would be impaired by the sale; but it was of no consequence who such owner might be. That Laughlin was justified in bringing suit seems reasonably clear, because Savage by his lack of fairness had practically limited the 30 days to 14, and Laughlin might well fear that he could not protect himself in the short time given. But that he was really damaged in any way is very difficult to understand. Savage clearly forfeited his forfeiture by so unfairly limiting the short term fixed by the contract as to destroy it. But this is all, and this was surely not an unmixed injury, as it got the forfeiture clause entirely out of Laughlin's way.

What if Savage and Glover did conspire to crowd the redemption period? Their acts took nothing from Laughlin. They simply took advantage of his own defaults. Why did he not keep up the contract payments, and see to it that all the taxes were paid? He took evidence showing that he is a rich man. Being abundantly able, he should have used a reasonable amount of diligence. It is true that Savage made an unfounded claim in respect to the 1906 payment, and was disposed to shut him out if he could; but Laughlin by his negligence placed this weapon in Savage's hands, whose action took nothing from Laughlin's right, but simply made the assertion of that right more difficult—justifying the aid of the court to prevent forfeiture, but nothing more. Savage should pay costs because his inequitable conduct made the suit necessary. Nor had he any standing to file a bill to quiet title before Laughlin's interest had been disposed of.

There should be a decree providing for a strict foreclosure of complainant's right and interest unless he pays the balance of the purchase price in full and $77.25 taxes paid by Savage to the North Wisconsin Company, with 6 per cent. from December 23, 1907, within four months, less the costs of this suit, which are to be taxed against the defendant. In case of appeal, and in the event of affirmance, such payments are to be made within four months from the filing of the mandate in this court. If defendant has paid any further taxes, complainant shall also repay the amount, with 6 per cent. interest, within the four months' period. Upon such final payment, defendant shall execute to complainant a warranty deed in the terms provided in the contract of sale.