IN RE PETITION OF S. R. A. INC.[1]

April 13, 1945.

No. 33,952.

[1]Reported in 18 N. W. (2d) 442.

See, 213 Minn. 487, 7 N. W. (2d) 484.

*Otis, Faricy & Burger,* for appellant.

*J. A. A. Burnquist,* Attorney General, *George B. Sjoselius,* Deputy Attorney General, *James F. Lynch,* County Attorney, and *Andrew R. Bratter,* Assistant County Attorney, for the State.

MATSON, JUSTICE.

This is an appeal from a judgment of the district court determining that the equitable title to certain real estate in St. Paul was on May 1, 1940, vested in the petitioner, S. R. A. Inc., and that the legal title thereto was then vested in the United States in trust for said petitioner as security for the payment of the balance of the purchase price, and further determining that said premises were not exempt or immune from the 1940 taxes assessed and levied on said date. Pursuant to the original petition filed for a review of the taxes for the year 1940 as provided by Minn. St. 1941, § 278.01 (Mason St. 1940 Supp. § 2126-1), hearing was had thereon which resulted in findings of fact and conclusions of law in favor of the petitioner. Upon appeal, the order of the lower court was reversed and the matter was remanded for retrial, as appears from our former decision in In re Petition of S. R. A. Inc. 213 Minn. 487, 7 N. W. (2d) 484, and upon such retrial the aforesaid judgment was entered. The only question now raised is whether our former decision denying tax exemption for said premises is the law of the case and controlling on this appeal in the light of the recent decision of the United States Supreme Court in United States v. County of Allegheny (1944) 322 U. S. 174, 64 S. Ct. 908, 88 L. ed. 1209, and certain other decisions cited by petitioner.

For convenience on this appeal, we shall summarize the facts, a more complete statement of which may be found in our former opinion. On May 26, 1939, the petitioner, as vendee, entered into an executory sales contract with the United States, as vendor, for

the purchase of the old post-office building in St. Paul for $121,101, to be paid, in addition to a down payment, in annual installments of $9,500 each during the succeeding nine years, and upon the making of the final payment on May 26, 1949, the United States agreed to convey a marketable title to said premises to the petitioner by quitclaim deed. Upon execution of the contract, the petitioner took full possession, razed the old building, erected a new one for commercial rental, and otherwise entered into the full beneficial use of the premises. On May 1, 1940, Ramsey county assessed the premises upon the same basis as other like property, listing it for taxation as being owned by S. R. A. Inc. *"subject to fee title remaining in the United States of America."* Instead of paying the taxes so levied, petitioner brought these proceedings. The issue as to the full and true valuation of said premises was determined by stipulation.

The decision of United States v. County of Allegheny, 322 U. S. 174, 179, 64 S. Ct. 908, 912, 88 L. ed. 1209, hereinafter designated as the Mesta case, is in our opinion not controlling. Mesta Machine Company was engaged in the manufacture of large field guns for the national government under a cost-plus-and-fixed-fee contract in which taxes levied against Mesta "upon the transaction of this purchase of guns" was a reimbursable cost item. Mesta owned a plant with certain machinery. Additional machinery, belonging to the United States, was leased to Mesta and affixed to the realty so as to be removable without injury to the premises. Allegheny county levied a real property ad valorem tax against Mesta's mill and in valuing the real estate for taxation specifically included the value of the machinery owned by the federal government. The Pennsylvania supreme court (Mesta Mach. Co. Case, 347 Pa. 191, 32 A. [2d] 236) held that the tax was levied on the mill as an entity; that, since the record title to the land was in Mesta regardless of who owned the machinery, its value was properly included as part of the real-estate valuation; and that, although the machinery was included in the valuation, the assessment was not against the United States or its property, but only against Mesta and its

realty holdings.  Upon appeal by Mesta, with the United States intervening, the United States Supreme Court held the assessment invalid as a violation of the federal constitution insofar as it purported (322 U. S. 192, 64 S. Ct. 918, 88 L. ed. 1209) "to authorize taxation of the property interests of the United States in the machinery in Mesta's plant, or to use that interest to tax or to enhance the tax upon the Government's bailee."  This decision involves facts and issues entirely different from the instant S. R. A. case and is to be distinguished in the following particulars: (1) Both the legal and the equitable title to the machinery, valued as part of the assessed tax valuation, were in the United States; (2) the entire plant, of which the machinery was an essential part, was by contract employed as a means to discharge the important national function of waging war; (3) the inclusion of the value of the machinery enhanced the burden of the lien on the underlying land, and if, by reason of this enhancement, it became necessary to collect the tax by selling the land, the result would be as disastrous to the war effort as if the machinery itself were sold; (4) Mesta as a bailee of the machinery was under a duty to assert the defense of tax immunity to protect the property interests of its bailor, the United States, from unlawful burdens.

Other decisions cited by the petitioner are hereinafter distinguished in our consideration of the land-grant doctrine.

■ Petitioner contends that the instant case is controlled by the decision of Irwin v. Wright, 258 U. S. 219, 42 S. Ct. 293, 66 L. ed. 573.  We submit that this decision, and all the land-grant cases in general, are not in point.  There is little if any similarity between the interest of an entryman as a beneficiary of a land grant and the vendee in a contract of purchase and sale.  In the former, the entryman acquires neither the equitable title nor the legal fee until he has completely fulfilled the conditions which entitle him to a patent, but in the case of the vendee the equitable title vests at once although the bare legal title remains in the vendor as security for the payment of the purchase price.

An examination of the land-grant acts in general reveals that the equitable title was purposely withheld from the entryman until he had complied with all conditions necessary for obtaining a patent, and this was done as a matter of congressional intent to insure that the public domain would be given only to stable citizens who had actually demonstrated that they were desirous and capable of establishing permanent homes. Similar considerations governed grants for the construction of railroads. In other words, we have a special statutory creation designed for developing the public domain. Obviously, the disposal of public lands was not a matter of sale at all but rather of a gift on condition, and this gift on condition was not according to the common-law concept, but according to certain statutory conditions designed to satisfy a special need. Missouri, Kansas, and Texas Ry. Co. v. Kansas Pacific Ry. Co. 97 U. S. 491, 24 L. ed. 1095. As a unique statutory creation, it has had nothing in common with a written contract for the sale of land except that it ultimately effected a transfer of title. In some respects, however, the interests of the entryman under this statutory creation may be compared to that of a donee under a parol gift of land under the statute of frauds.[2]

An examination of the Homestead Act in particular (see, 43 USCA, §§ 161-302), anent which most of our land-grant decisions have been made, indicates that congress has thereby created a set of legal and equitable relationships between the homestead entryman and his government which bear very little resemblance to the legal and equitable principles governing a vendor and vendee. The act constitutes the government's standing offer to donate and convey a limited portion of the public domain to certain natural, though unidentified, persons who are able to qualify themselves to

---

[2] "* * * It has been said that a parol gift of land is on the same footing as a parol sale of land, and that in order to take a parol gift of land out of the statute of frauds possession must be taken in pursuance of the gift, and *as a further condition to the consummation of the equitable right and title, the donee must have made improvements of a valuable and permanent character, induced thereto by the promise to give the land.*" (Italics supplied.) 24 Am. Jur., Gifts, § 68. See, 38 C. J. S., Gifts, § 57.

accept the offer by complying with specified conditions precedent. As a preliminary to qualifying himself to accept the offer, the entryman must identify himself and the homestead premises he desires by an act of registration or entry. Until he has qualified himself for acceptance of the offer by complying with the residential, improvement, cultivation, and other statutory requirements, he has no vested right against the government. Unlike the vendee under a contract of purchase, he has no devisable estate, no right of alienation except for specified public purposes, no right to change his residence, no right to declare himself a trustee of the land for another, and, with certain statutory exceptions, he may not even intermarry with an entrywoman. Unlike the vendor, the government as offering donor on condition has no right of specific performance and no right to damages for breach of condition; in fact, there is no binding contract. The entryman is free at all times, without penalty or liability of any kind, to abandon his efforts to qualify himself for acceptance of the government's offer to convey by patent.

In Hall v. Russell, 101 U. S. 503, 25 L. ed. 829, we have a typical land-grant case involving the construction of the Oregon Donation Act to determine the congressional intent and the property rights resulting thereunder. One Loring, a single man, in 1852 settled on the land with a view to becoming its owner under the operation of the act. He had all the qualifications necessary to enable him to take and hold under the act, but died after a residence on the land of less than a year, leaving a will whereby he devised his entire estate, with minor exceptions, to one Hall. The question for determination on appeal was whether Loring had a devisable estate. (See, Oregon Donation Act [9 Stat. 496, c. 76], the relevant sections of which provide.³) Mr. Chief Justice Waite, in holding that

---

³"Sec. 4. * * * That there *shall be, and hereby is, granted* to every white settler or occupant of the public lands, * * * now residing in said Territory, or who shall become a resident thereof on or before the first day of December, eighteen hundred and fifty, *and who shall have resided upon and cultivated the same for four consecutive years, and shall otherwise conform*

settler Loring had no devisable estate, said (101 U. S. 509, 25 L. ed. 831):

"The opening words of sect. 4 are 'that there shall be, and hereby is, granted.' This is appropriate language in which to express a present grant, but as was well remarked by Mr. Justice Field for the court in Missouri, Kansas, and Texas Railway Company v. Kansas Pacific Railway Company (97 U. S. 491, 24 L. ed. 1095), 'It is always to be borne in mind, *in construing a congressional grant, that the act by which it is made is a law as well as a conveyance, and that such effect must be given to it as will carry out the*

---

*to the provisions of this act*, the quantity of one half section, * * *: *Provided, further*, That all future contracts by any person or persons entitled to the benefit of this act, for the sale of the land to which he or they may be entitled under this act before he or they have received a patent therefor, shall be void: * * *.

"Sec. 5. * * * That to all white male citizens of the United States * * * emigrating to and settling in said Territory between the first day of December, eighteen hundred and fifty, and the first day of December, eighteen hundred and fifty-three; * * * *who shall * * * comply with the foregoing section* and the provisions of this law, *there shall be, and hereby is, granted* the quantity of one quarter section, * * * if a single man; or if married, * * * the quantity of one half section, * * *."

"Sec. 7. * * * That within twelve months after the surveys have been made, or, where the survey has been made before the settlement, then within twelve months from the time the settlement was commenced, each person claiming a donation right under this act shall prove to the * * * surveyor-general, * * * that the settlement and cultivation * * * had been commenced, specifying the time of the commencement; and at any time *after the expiration of four years from the date of such settlement, * * * shall prove in like manner, * * * the fact of continued residence and cultivation* required by the fourth section of this act; and upon such proof being made, * * * patents shall issue for the land * * *.

"Sec. 8. * * * That upon the death of any settler before the expiration of the four years' continued possession required by this act, all the *rights* of the deceased under this act shall descend to the heirs at law of such settler, including the widow, where one is left, in equal parts; and proof of compliance with the conditions of this act up to the time of the death of such settler shall be sufficient to entitle them to the patent." (Italics supplied.)

*intent of Congress.'* There cannot be a grant unless there is a *grantee, and consequently there cannot be a present grant unless there is a present grantee.* If, then, the law making the grant indicates a future grantee and not a present one, the grant will take effect in the future and not presently. * * *

"Coming then to the present case we find that the grantee designated was any qualified 'settler or occupant of the public lands * * * who shall have resided upon and cultivated the same for four consecutive years, and shall otherwise conform to the provisions of the act.' *The grant was not to a settler only, but to a settler who had completed the four years of residence, &c:, and had otherwise conformed to the act.* Whenever a settler qualified himself to become a grantee, he took the grant and his right to a transfer of the legal title from the United States became vested. *But until he was qualified to take, there was no actual grant of the soil.* The act of Congress made the transfer only when the settler brought himself within the description of those designated as grantees. *A present right to occupy and maintain possession,* so as to acquire a complete title to the soil, *was granted* to every white person in the Territory having the other requisite qualifications, *but beyond this nothing passed until all was done that was necessary to entitle the occupant to a grant of the land.* Whether the fee passed out of the United States before the claim was 'proved up,' it is not necessary now to consider. For the purposes of the present suit it is enough to show that *the occupant got no title himself, beyond that of a mere right of possession, until he had completed his four years of continued residence and cultivation.*

* * * * *

"Another provision is equally significant: 'All future contracts by any person entitled to the benefit of this act, for the sale of the land to which he may be entitled under this act before he or they have received a patent therefor, shall be void.' This must refer to sales after the necessary residence and cultivation were complete, because *the grant was only to a settler 'who shall have resided upon and cultivated the same for four consecutive years.'* * * *

\* \* \* \* \*

·"We conclude, therefore, that under sect. 4 *there was no grant of the land to a settler until he had qualified himself to take as grantee by completing his four years of residence and cultivation, and performing such other acts in the mean time as the statute required in order to protect his claim and keep it alive. Down to that time he was an authorized settler on the public lands, but not a grantee. His rights in the land were statutory only, and cannot be extended beyond the just interpretation of the language Congress has used to make known its will."* (Italics supplied.)

In Irwin v. Wright, 258 U. S. 219, 232, 42 S. Ct. 293, 298, 66 L. ed. 573, 589, Mr. Chief Justice Taft recognized the land-grant entryman's interest as a special statutory creation when he said:

"\* \* \* We think, therefore, that the reason for the rule, making the acquisition of the equitable title the line between non-taxability and taxability, is stronger in case of reclamation homestead entrymen than in the instances where, before the Reclamation Act, it always applied. Moreover, the confusion caused in the past by the taxation, when specifically permitted, of indefinite and inchoate interests of the beneficiaries of government land grants, should prevent an inference of the congressional intention to depart from the rule requiring an equitable title in the entryman before state taxation, unless a purpose to permit earlier taxation is express or strongly implied."

Obviously, the congressional intent as expressed in the land-grant statutes is that the *equitable* title shall pass to the entryman only upon full compliance with all conditions necessary for obtaining a patent, and that the equitable title and the *right to a patent* shall be inseparable twins in their passage from the government to the entryman. It is difficult to understand how the principle of this special statutory creation ever came to be applied to the vendor-vendee relationship in cases involving the right of a state to tax the interest of the vendee under a contract where the federal government is the vendor. Typical of these cases are United States v.

City of Milwaukee (7 Cir.) 100 F. 828; Lincoln County v. Pacific Spruce Corp. (9 Cir.) 26 F. (2d) 435; Mint Realty Co. v. Philadelphia, 218 Pa. 104, 66 A. 1130, 11 Ann. Cas. 388; ABR Corp. v. City of Newark, 131 N. J. L. 147, 35 A. (2d) 473; and Ken Realty Co. Inc. v. Johnson (5 Cir.) 138 F. (2d) 809. The confusion apparently has arisen from the erroneous assumption that, because the entryman or beneficiary under a federal land grant acquires as against the sovereign no equitable title until he has complied with all conditions necessary to obtain a patent, the same result necessarily follows under a contract for deed *where the sovereign is the vendor,* and that therefore no equitable title vests in the vendee until he has performed all the contract terms and conditions prerequisite for obtaining a deed. With this error as a foundation, it has been further assumed that the decisions in the land-grant cases, of which Irwin v. Wright, *supra,* is typical, establish the principle that under no circumstance is the interest of the vendee subject to state taxation until he has acquired, by complete performance of all contract terms and conditions, a right to a deed of conveyance on the theory that until such time both the equitable title and the legal fee remain in the sovereign vendor. Clearly, the land-grant cases are not in point and establish no principle applicable to contracts for the outright sale of government property. Obviously, the legal consequences of a sales contract are not determined by the special statutory provisions enacted by congress to govern the disposal of the public domain.

■ From the making of his entry until he satisfies the conditions requisite for obtaining a patent, the entryman has no vested equitable right by way of title, but only a right of possession as against trespassers and all others except the United States. His right to remain on the land in order to perform the conditions requisite for obtaining a patent may be regarded as an inceptive or inchoate title from the standpoint that only his own failure to qualify will prevent him from obtaining a vested equitable title accompanied by the right to a patent. See, Knapp v. Alexander-Edgar Lbr. Co. 237 U. S. 162, 35 S. Ct. 515, 59 L. ed. 894. But see,

Norton v. Evans (8 Cir.) 82 F. 804, 27 C. C. A. 168. In some of the land-grant cases the right to remain on the land to perform the statutory conditions has been loosely referred to as an equitable title, but it is to be noted that in these very cases there had *not* been a full performance of all the conditions necessary for the accrual of a *right* to a patent, and therefore the equitable title had not passed to the grantee. For example, in the case of N. P. R. Co. v. Traill County, 115 U. S. 600, 6 S. Ct. 201, 29 L. ed. 477, the doctrine of which can best be ascertained by a perusal of the two decisions on which it is based, namely, Railway Co. v. Prescott, 16 Wall. 603, 21 L. ed. 373, and Railway Co. v. McShane, 22 Wall. 444, 22 L. ed. 747, the right to a patent had not been perfected, and, therefore, both the equitable and the legal titles remained in the United States as security for the payment of the costs of making the surveys. In effect, the lien was both equitable and legal in its nature, and obviously the court could not allow a state tax upon an equitable estate still retained by the sovereign. Misunderstanding and confusion result only when we forget that as a statutory creation the equitable title and the right to a patent are Siamese twins, and one does not go without the other. In the land-grant cases, we speak of a complete equitable title only in the sense that the right to the passage of such title has fully accrued.

■ Further confusion resulted from the plausible though erroneous theory, adopted by some courts, that the entryman acquired an equitable title piecemeal, or on the installment plan, until he earned a *perfect* or *complete* title by having complied with all the conditions prerequisite to obtaining a patent. The entryman in fact acquired nothing until the instant he was entitled to everything. If his compliance with the statutory conditions fell short in any essential he had nothing, but the instant he had fully complied with them the equitable estate burst into full blossom as his property, and simultaneously therewith he acquired the right to a patent. Later, this anomalous doctrine of acquiring a *complete* equitable title on the installment plan was applied to the interest of the vendee under a contract for deed for the sale of land by the

sovereign. In Lincoln County v. Pacific Spruce Corp. (9 Cir.) 26 F. (2d) 435, *supra,* the court in applying this theory held that only he who had acquired a *perfect* equitable title was subject to taxation. The court in Ken Realty Co. Inc. v. Johnson (5 Cir.) 138 F. (2d) 809, *supra,* however, expressly refused to follow the Lincoln County case and carried the theory to its logical conclusion by arriving at the curious result of holding the vendee subject to taxation on that fraction of the equitable title acquired to the date of each annual tax levy. It was held that the value of such fractional equity as a taxable interest was to be (138 F. [2d] 812) "measured each tax year by the value of the whole property diminished by the amount of unpaid purchase money." The wrongful interpretation of the principle of the land-grant cases and its misapplication to contracts for the sale of land by the sovereign have been bad enough without confusing the issue still further by giving birth to the doctrine that the equitable title passes from the vendor to the vendee on a piecemeal basis. Fundamental legal principles are not to be distorted merely because the sovereign is a party to the transaction. We choose to stand on the well-established principle that the equitable estate, in its entirety, passes immediately to the vendee at the moment the contract goes into effect, and the bare legal title for security purposes remains in the vendor. The vendee's equitable title may be divested for failure of the vendee to perform the conditions of the contract; but, until divested, such equitable title is wholly in the vendee. Village of Hibbing v. Commr. of Taxation, 217 Minn. 528, 14 N. W. (2d) 923; Town of Wolf River v. Wisconsin Michigan Power Co. 217 Wis. 518, 259 N. W. 710, 98 A. L. R. 1369. The instant vesting of the entire equitable title in the purchaser is consistent with his right to enjoy the entire use and benefit of the property (inclusive of both profits and increments in value) although he has paid only a fraction of the purchase price.

Aside from the fundamental difference between the interest of an entryman under a land grant and the interest of a vendee in a contract for deed, there is a further distinction between the in-

stant case and the land-grant cases based on the fact that entirely different governmental policies and objectives are involved. The settlement and development of the public domain entailed the exercise of a major federal function that is not for a moment to be confused with the humdrum task of disposing of useless post-office property, useless in the sense that it no longer serves any governmental function. In Irwin v. Wright, *supra,* Mr. Chief Justice Taft called specific attention to the importance of the land-grant policies when he said (258 U. S. 231, 42 S. Ct. 298, 66 L. ed. 589): "The care with which the Government has thus framed its land policy to protect and encourage the homesteader is shown further in Ruddy v. Rossi, 248 U. S. 104, 105."[4] The function of settling the public domain was of such importance that congress was fully justified in withholding from the entryman the equitable title, not merely for the purpose of insuring that such lands would go only to those individuals who demonstrated their good faith and capacity as homemakers, but to leave them free from any burden of taxation until they had become firmly established. Here we have no such important federal function or interest. The sale of a piece of federal property which is no longer of use as a post office or for any other federal function is on the one hand for the mere purpose of salvaging its value and on the other hand for the purpose of returning it to the state tax rolls to bear its just share of the costs of local government. The levying of state taxes upon the equitable title of the petitioner impairs the exercise of no federal function. The implication that the petitioner justifiably paid more for the property than it would have done if it had not relied

---

4In Ruddy v. Rossi, 248 U. S. 104, 105, 39 S. Ct. 46, 63 L. ed. 148, 150, 8 A. L. R. 843, which upheld the constitutionality of § 4 of the Homestead Act of May 20, 1862 (Rev. Stat. § 2296, 43 USCA, § 175), providing that no lands acquired under the act should ever become liable for the satisfaction of any debt contracted prior to. the issuing of the patent, Mr. Justice McReynolds said: "*A manifest purpose was to induce settlement upon and cultivation of these lands by those who, five years after proper entry, would become owners in fee through issuance of patents. The great end in view was to convert waste places into permanent homes.*" (Italics supplied.)

on tax immunity is unsound, and this is likewise true of the contention that to deny tax immunity to a vendee under an executory contract will prevent the federal government from realizing all that it is entitled to upon sale. Only a property interest or value is subject to sale, and whatever more is paid in excess of such value by reason of an alleged tax immunity is for a privilege that cannot constitutionally be sold or transferred. The individual never enjoys tax immunity as a right but only as an incidental windfall when, and only as long as, the imposition of a state tax in some way impairs, or interferes with, the exercise of a federal function.

■ It is well established by Minnesota decisions that a contract for the sale of land, part of the purchase price being paid, vests in the vendee an equitable title in fee with the bare legal title remaining in the vendor as security, and upon payment the vendor holds it in trust for the vendee. First & American Nat. Bank v. Whiteside, 207 Minn. 537, 292 N. W. 770; Village of Hibbing v. Commr. of Taxation, 217 Minn. 528, 14 N. W. (2d) 923.[5]

It is likewise the federal rule that a contract for the sale of land, part of the purchase price being paid, vests in the vendee the equitable title with the bare legal title remaining in the vendor for security. In Lenman v. Jones, 222 U. S. 51, 54, 32 S. Ct. 18, 20, 56 L. ed. 89, 92, involving an appeal from a decree of the court of appeals of the District of Columbia, Mr. Justice Holmes, in referring to the appellee, who was the assignee of the vendee's interest in an executory contract for the purchase of land, said:

"* * * As she in popular legal language became the equitable owner by her contract, she made the appellee the equitable owner by her contract with him—that is she gave him the right to insist

5Chemedlin v. Prince, 15 Minn. 263 (331); Groff v. Ramsey, 19 Minn. 24 (44); Randall v. Constans, 33 Minn. 329, 23 N. W. 530; Shraiberg v. Hanson, 138 Minn. 80, 163 N. W. 1032; Greenfield v. Olson, 143 Minn. 275, 173 N. W. 416; Benjamin v. Savage, 154 Minn. 159, 191 N. W. 408, 35 A. L. R. 97; Mark v. Liverpool & L. & G. Ins. Co. 159 Minn. 315, 198 N. W. 1003, 38 A. L. R. 310; Minnesota B. & L. Assn. v. Closs, 182 Minn. 452, 234 N. W. 872; In re Petition of S. R. A. Inc. 213 Minn. 487, 7 N. W. (2d) 484.

in her place that the legal owner should give up the legal estate upon fulfillment of the conditions agreed."

In Bissell v. Heyward, 96 U. S. 580, 586, 24 L. ed. 678, 679, in speaking of an executory contract for the sale of land, the court said:

"* * * The execution of the contract (with the partial payment thereon) was a transfer in equity of the title of the land to Bissell; leaving in the representatives of William C. Heyward simply a naked title as trustee for Bissell, to be conveyed upon performance on his part."

It is recognized that this is the general rule (First State Bank v. United States [9 Cir.] 92 F. [2d] 132, 134; First Nat. Bank v. Glens Falls Ins. Co. [4 Cir.] 27 F. [2d] 64, 67), and that it has existed from time immemorial. National Bank of Kentucky v. Louisville Trust Co. (6 Cir.) 67 F. (2d) 97, 100. See, C. L. Gransden & Co. v. Commr. of Int. Rev. (6 Cir.) 117 F. (2d) 80; Lewis v. Hawkins, 23 Wall. 119, 23 L. ed. 113; Laughlin v. North Wisconsin Lbr. Co. (7 Cir.) 176 F. 772; In re Estate of Reid, 26 Cal. App. (2d) 362, 79 P. (2d) 451; Calvin v. Custer County, 111 Mont. 162, 107 P. (2d) 134.

The same court which originated the piecemeal doctrine of equitable conversion in Ken Realty Co. Inc. v. Johnson (5 Cir.) 138 F. (2d) 809, held in Burger-Phillips Co. v. Commr. of Int. Rev. (5 Cir.) 126 F. (2d) 934, that a vendee under an executory contract for the purchase from the United States of the old post-office building in Birmingham, Alabama, with part of the purchase price paid and part unpaid, had an interest in land and that the United States as trustee for the vendee held the legal title, which it was bound to convey upon receiving full payment.

No basis exists for making an exception to the general rule where the government is the vendor. We respectfully submit that there is no federal authority holding that the equitable title fails to vest immediately in the vendee under an executory contract for sale of land, part of the purchase price being paid, merely because

the sovereign is the vendor, except those decisions of the lower federal courts erroneously based on the land-grant doctrine and of which United States v. Milwaukee (7 Cir.) 100 F. 828, is typical. Although the government is the vendor, the general rule must control. In the absence of pertinent federal decisions or statutory provisions to the contrary, contracts between the United States and a citizen or private corporation are controlled by the same legal principles that govern contracts between private individuals. "The United States, when they contract with their citizens, are controlled by the same laws that govern the citizen in that behalf. All obligations which would be implied against citizens under the same circumstances will be implied against them." United States v. Bostwick, 94 U. S. 53, 66, 24 L. ed. 65, 66; Cory Bros. & Co. v. United States (2 Cir.) 51 F. (2d) 1010, 1012. See, United States v. Guaranty Trust Co. 293 U. S. 340, 55 S. Ct. 221, 79 L. ed. 415, 95 A. L. R. 651; and Mason v. United States, 260 U. S. 545, 43 S. Ct. 200, 67 L. ed. 396.

5. In the former S. R. A. opinion, 213 Minn. 487, 7 N. W. (2d) 484, it was clearly pointed out that the equitable title of the vendee is subject to taxation although the sovereign as vendor stood immune from any tax levy. What would be the result in a case where the vendee is immune from taxation but the vendor is not? Reversing the situation in the instant case, does the equitable title of the vendee become immune from taxation under an executory contract in passing from a vendor who enjoys no tax immunity to a vendee who does enjoy such immunity? Since the former S. R. A. case, this court has answered this question in the affirmative in Village of Hibbing v. Commr. of Taxation, 217 Minn. 528, 14 N. W. (2d) 923. In this latter case the Oliver Iron Mining Company as the vendor was subject to tax liability, but the vendee, the Benedictine Sisters Benevolent Association, if found to be the owner of the property, was exempt from taxation under Minn. Const. art. 9, § 1, in that it had acquired the property for use as a nonprofit public hospital. It became necessary to determine, among other things, whether at the time of the tax levy on May 1, 1941

(when the association still held merely as a vendee under an executory contract), the association was the owner of the hospital property within the meaning of the tax-exemption provisions of the constitution. The court in holding that it was such owner said (217 Minn. 533, 14 N. W. [2d] 926):

"3. Although the legal title was in Oliver on May 1, 1941, the association was the *owner* of the property within the meaning of the tax exemption provisions of the constitution and the statute. While an executory contract for a sale or conveyance of land conveys in law no legal title, * * * in equity the purchaser is regarded, for purposes of taxation as well as for others, as the owner, subject to liability for the unpaid price, and the vendor as holding the legal title in trust for him."

Another significant decision, in reverse of the instant case, and with the United States as the vendee, illustrating that the equitable title passes under an executory contract even though the sovereign is a party, and further illustrating that the tax status of the vendor, as to liability or nonliability for taxes, does not pass to the vendee with the passage of the equitable title, is the case of Calvin v. Custer County, 111 Mont. 162, 107 P. (2d) 134. On April 28, 1938, Calvin gave the United States a written option to purchase certain lands, and on June 17, 1938, the latter accepted the option, subject to the obligation of Calvin to give good title, and took possession. The deed of conveyance was executed and delivered on November 15, 1939. By Montana statutes, taxes were then levied in March of each year. Defendants contended that the United States was not the owner of the property until the deed was delivered, and that therefore the property was subject to the taxes levied in March 1939. Although the final conveyance to the United States pursuant to executory contract of purchase would not have been made if the title had not been made good by Calvin, the court found that the equitable title was in the United States (as soon as the option was accepted) on the day the 1939 taxes were

levied and therefore exempt from taxation. The court said (111 Mont. 167, 168, 107 P. [2d] 136):

"In the case of Town of Cascade v. County of Cascade, 75 Mont. 304, 243 Pac. 806, 808, it was said: 'It is the situation or character of the beneficial owner, the holder of the equitable title or estate, and not that of the holder of the legal title, * * * determines the question of exemption from taxation under our constitutional provisions and those of like import.'

*　*　*　*　*

"* * * We think that in determining in whom the equitable interest vested we must treat the United States as if it were a private person or corporation, amenable to suit."

■ Summarizing to this point, we hold that the doctrine of the land-grant cases, a statutory creation designed to meet a special need, has no application to the vendor-vendee relationship under an executory contract for the sale of land by the sovereign. The general rule that a contract for the sale of land, part of the purchase price being paid, vests in the vendee the equitable title with the bare legal title remaining in the vendor as security for payment of the purchase price, applies to contracts where the vendor is the federal government as well as to contracts between citizens. Neither the vendor's liability for nor immunity from taxation passes with the equitable title to the vendee. The character or status of the owner of the equitable title and not that of the holder of the legal title determines whether the equitable estate is subject to taxation. A tax levy upon the vendee's equitable interest is not, directly or indirectly, a tax upon the vendor's legal estate.

■ Although we here find that no state tax has been imposed on any federal property, and that no immunity from taxation possessed by the vendor passed to the vendee as an incident to its acquirement of the equitable title, does the levy of a tax on the vendee's equitable title, by indirection or otherwise, interfere with the exercise of a governmental function? We think not. We have already pointed out that the sale of an old post-office property

which is no longer of use is merely for the dual purpose of salvaging its investment value and for returning it to the state tax rolls. The exercise of the state's taxing power in a uniform and nondiscriminatory manner so as to impose no greater burden upon the buyers of government property than upon other buyers is not in violation of the implied tax-immunity doctrine. All that is required is that the sovereign, state or federal, be assured a fair and nondiscriminatory sale market in competing with other vendors. We shall, however, assume that property might bring a higher price if it were known in advance that the purchaser's equity would not be subject to taxation. The United States Supreme Court, in Group No. 1 Oil Corp. v. Bass, 283 U. S. 279, 282, 51 S. Ct. 432, 433, 75 L. ed. 1032, 1036, with respect to taxation of the purchaser's interest, established the following rule:

"But the remote and indirect effects upon the one government of such a non-discriminatory tax by the other have never been considered adequate grounds for thus aiding the one at the expense of the taxing power of the other. See Willcuts v. Bunn, 282 U. S. 216, 231, 51 S. Ct. 125, 75 L. ed. 304, 71 A. L. R. 1260; Educational Films Corp. v. Ward, 282 U. S. 379, 51 S. Ct. 170, 75 L. ed. 400, 71 A. L. R. 1226; Metcalf & Eddy v. Mitchell, 269 U. S. 514, 523-524, 46 S. Ct. 172, 70 L. ed. 384. This Court has consistently held that where property *or any interest in it* has completely passed from the government to the purchaser, he can claim no immunity from taxation with respect to it, merely because it was once government-owned, or because the sale of it effected some government purpose. New Brunswick v. United States, 276 U. S. 547, 48 S. Ct. 371, 72 L. ed. 693, *supra;* [and other cases cited].

"Property which has thus passed from either the national or a state government to private ownership becomes a part of the common mass of property and subject to its common burdens. Denial to either government of the power to tax it, or income derived from it, in order to insure some remote and indirect antecedent benefit to the other, would be an encroachment on the sovereign power to

tax, not justified by the implied constitutional restriction." (Italics supplied.)

Mr. Justice Stone, who wrote the opinion in the foregoing case, later in Helvering v. Gerhardt (1938) 304 U. S. 405, 58 S. Ct. 969, 82 L. ed. 1427, put "the problem of implied immunities in terms of a balancing of the protection to one government against the diminution of the taxing power of the other." 26 Minn. L. Rev. 408, 409. The trend of recent decisions is to limit the scope of implied immunities "to prevent the immunity doctrine from unduly restricting the tax sources of the federal and state governments." Rottschaefer, American Constitutional Law (1939) § 82, p. 110. During the present period of constant expansion of federal government property holdings and activities, to be reasonably followed after the war by a sale of much property no longer needed for military purposes, it becomes imperative to protect the state taxing power from diminution through the indirect sale of tax immunity to the many purchasers of federal property. In the instant case, the federal government has parted with its entire equitable estate to S. R. A. Inc., and therefore the latter can claim no immunity.

■ Does the taxation of S. R. A.'s equitable interest impair the security value of the federal government's legal title? Clearly not. Petitioner's contention that the state cannot hold a tax sale of vendee's equitable interest without having such sale confer a title paramount to all others so as to destroy the lien of the United States is without foundation, as pointed out in our former S. R. A. opinion, 213 Minn. 487, 496, 7 N. W. (2d) 484, 489.

Mr. Justice Holmes in Baltimore Shipbuilding & Dry Dock Co. v. Baltimore, 195 U. S. 375, 25 S. Ct. 50, 49 L. ed. 242, *in modifying or limiting* the application of N. P. R. Co. v. Traill County, 115 U. S. 600, 6 S. Ct. 201, 29 L. ed. 477, pointed out that a state may levy a tax on a limited interest or estate in the property and, upon default, sell such limited interest or estate, subject to,

and without disturbing or impairing, an outstanding superior lien or other estate.[6]

In New Brunswick v. United States, 276 U. S. 547, 48 S. Ct. 371, 72 L. ed. 693, we have another case in point. The United States Housing Corporation, a federal agency, had built in New Jersey residences to house warworkers of World War I. After the war, having no further use for the buildings, the houses were sold to purchasers upon a ten-percent down payment with a mortgage back for the balance. Many purchasers, pursuant to sales contracts, had made the ten-percent down payment and were in possession but had neither received a deed of conveyance nor executed and delivered a mortgage for the balance when the city

---

[6]In Baltimore Shipbuilding & Dry Dock Co. v. Baltimore, 195 U. S. 381-382, 25 S. Ct. 51, 49 L. ed. 244, Mr. Justice Holmes said:

"* * * It is true that commonly taxes on land create a lien paramount to all interests, and that a tax sale often has been said to extinguish all titles and to start a new one. Hefner v. Northwestern Life Ins. Co., 123 U. S. 747, 751, 8 S. Ct. 337, 31 L. ed. 309, 311; Textor v. Shipley, 86 Maryland, 424, 438, 38 A. 932; Emery v. Boston Terminal Co., 178 Massachusetts, 172, 184, 59 N. E. 763, 86 A. S. R. 473. Perhaps it was assumed that this always was the effect of tax sales in Northern Pacific Railroad v. Traill Co., 115 U. S. 600, 6 S. Ct. 201, 29 L. ed. 477. But it needs no argument to show that a State may do less. It may tax a life estate to one and a remainder to another, and sell only the interest of the party making default. With regard to what the State of Maryland has done and what are the purport and attempted effect of the tax in this case, we follow the Court of Appeals. That court treated the tax and the lien as going only to the Dock Company's interest in the land, * * *.

"In the next place, as to the interest of the United States in the land. This is a mere condition subsequent. There is no easement or present right *in rem*. The obligation to keep up the dock and to allow the United States to use it carries active duties and is purely personal. The property is subject to forfeiture, it is true, if the obligation is not fulfilled. But it is only by forfeiture that the rights of the United States can be enforced against the *res*. It would be a very harsh doctrine that would deny the right of the States to tax lands because of a mere possibility that they might lapse to the United States. The contrary is the law. The condition cannot be extinguished by the State,' but the fee is in the Dock Company, and that can be taxed, and, if necessary, sold, subject to the condition."

of New Brunswick assessed upon the full value of the property certain taxes for the year 1921. No deeds having been delivered at the time of the tax levy, the legal title was still in the federal agency. The housing corporation, with the United States joining by intervention, brought suit to enjoin any tax sales for the collection of the taxes. The court held that in equity the purchasers were the equitable owners and entitled to a conveyance of the title upon executing a mortgage as stipulated, and that they should be treated for the purposes of taxation as if they already held the legal title with a first lien in the United States to secure the balance of the purchase price. In pointing out how the paramount security right of the United States may be protected, the court in significant language said (276 U. S. 556, 48 S. Ct. 373, 72 L. ed 698) :

"* * * although the City should not be enjoined from collecting the taxes assessed to the purchasers by sales of their interests in the lots, as equitable owners, it should be enjoined from selling the lots for the collection of such taxes unless all rights, liens and interests in the lots, retained and held by the Corporation as security for the unpaid purchase moneys, are expressly excluded from such sales, and they are made, by express terms, subject to all such prior rights, liens and interests. This, we think, will * * * fully protect the paramount right of the United States."

The New Brunswick and the Baltimore Shipbuilding Company cases, as well as that of United States v. Canyon County (Idaho) (D. C.) 232 F. 985 (the principle of this latter case allowing state taxation subject to a security lien in favor of the United States was approved in Irwin v. Wright, 258 U. S. 219, 42 S. Ct. 293, 66 L. ed. 573, *supra*), establish clearly how the state may protect the federal government's paramount lien right and how in turn the federal government may protect itself.

■ Any difference between a security right obtained under a mortgage and that provided for by the retention of the legal title under an executory sales contract is a matter of form only and

not of substance. See, former S. R. A. opinion, 213 Minn. 487, 495-496, 7 N. W. (2d) 484, 488-489; First & American Nat. Bank v. Whiteside, 207 Minn. 537, 543, 292 N. W. 770, 774; McCreary v. McGregor, 183 Iowa 732, 167 N. W. 633; and Hatch v. Commerce Ins. Co. 216 Iowa 860, 249 N. W. 164.

All other issues raised by this appeal are fully determined by our prior S. R. A. opinion in 213 Minn. 487, 7 N. W. (2d) 484, and we find nothing in the authorities submitted by petitioner to justify its contention that such former decision is no longer the law of the case on this appeal.

The judgment appealed from is affirmed.